# EXHIBIT G

1  STATE OF ILLINOIS )
                     )  SS:
2  COUNTY OF C O O K )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION
4
   THE PEOPLE OF THE STATE    )
5  OF ILLINOIS                )
                              )
6     vs.                     )  No.  07-CR-12286
                              )
7  JEFFERY PLANEY             )
   PAUL POWERS                )
8  GREGORY BARNES             )

9

10         REPORT OF PROCEEDINGS had at the

11  continued trial in the above-entitled cause before

12  the HONORABLE THOMAS V. GAINER, Judge of said court,

13  on the 24th day of March 2009.

14  PRESENT:

15  HONORABLE ANITA M. ALVAREZ,
    STATE'S ATTORNEY OF COOK COUNTY, by:
16  MS. LUANN SNOW, MR. ROMANO DIBENEDETTO
    and MS. LAUREN FREEMAN,
17  ASSISTANT STATE'S ATTORNEYS,
        appeared on behalf of the People;
18
    MR. THOMAS NEEDHAM,
19      appeared on behalf of Jeffery Planey;
    MS. LORI LIGHTFOOT, MR. DAVID COLE, III
20  and MS. JESSICA FELKER,
        appeared on behalf of Paul Powers;
21  MR. WILL FAHY,
        appeared on behalf of Gregory Barnes.
22
   Annette M. Golab
23 Official Court Reporter
   License No. 084-001693
24

                        1

1   the video was being run at half speed and today it is at

2   full speed.  But my recollection was yesterday in the

3   morning during the testimony of Jodi Agee and Kevin

4   O'Janovac at least when I was using the video it was

5   being run at full speed.  And it was only run at half

6   speed during the direct examination of Barry Gilfand.  I

7   don't know if that is of any moment.

8        THE COURT:  Well, at some point before we finish

9   this trial for me you will all run this full speed and

10  run the same clip at half speed just so when I am looking

11  at it on my own I will be able to tell the difference.

12  Proceed, Mr. DiBenedetto.

13                    (Witness duly sworn.)

14                    EMILY M. MARTIN,

15  called as a witness on behalf of the People of the State

16  of Illinois, after having been first duly sworn, was

17  examined and testified as follows:

18                    DIRECT EXAMINATION

19                    BY MR. DIBENEDETTO:

20       Q.   Miss Martin, would you please tell the Judge

21  your full name and spell it for the court reporter?

22       A.   Emily M. Martin, E-m-i-l-y, M. M-a-r-t-i-n.

23       Q.   And without disclosing your exact address, do

24  you live in the city of Chicago?

                              133

1    that were involved in the incident.

2        Q.   Now, in terms of what you refer to as off-duty

3    police officers, had you seen them at the bar before this

4    night?

5        A.   I had seen them around maybe once or twice, but

6    not frequently.

7        Q.   How is it that you came to know that they were

8    off-duty police officers?

9        A.   Lindsay, another girl who works there, told me

10   that they were.

11       Q.   Did you know any of the as you describe them

12   off-duty police officers by name?

13       A.   No.

14       Q.   Now, you indicated you were serving.  Did you

15   serve the off-duty police officers any drinks?

16       A.   Just maybe two rounds of bottled beer.  They

17   bought them like in quantities.  So they might buy like

18   eight beers, and they paid me cash for them.  Some of

19   them were going to the bar.  I don't know what they were

20   buying there.

21       Q.   So in terms of rounds, when you say two rounds,

22   are you referring to each round being a round of beers

23   being brought to the table?

24       A.   Yes.

137

1          Q.    In addition to that, was that table making any

2     other purchases of alcohol that you saw?

3          A.    Not from me, but they were from the bar.

4          Q.    What do you mean that they were from the bar?

5          A.    Some people like to get up and buy their drinks

6     from the bar rather than go through a server.  So that

7     was happening.

8          Q.    With respect to the course of that evening,

9     what if anything out of the ordinary first drew your

10    attention to something?

11         A.    There was a large loud noise behind me, and

12    then when I turned around there was a caddy on the

13    ground.

14         Q.    When you said there was a loud noise behind

15    you, where were you at this point?

16         A.    I was sitting at the bar.  I was already cut

17    from work, so I wasn't serving tables any more and I was

18    facing the TV.  So my back was to those booths were the

19    caddy was.

20         Q.    When you say you were at the bar, were you at

21    the end of the bar closer to the kitchen area or closer

22    to the entrance area?

23         A.    Closer to the kitchen area.

24         Q.    And which way does the bar run, if you know,

138

1    direction wise?

2         A.    East and west.

3         Q.    So were you closer to the east side of the bar

4    or the west side of the bar?

5         A.    The east side.

6         Q.    Now, you indicated that you heard a caddy fall.

7    What did you do next?

8         A.    Can you repeat that?  I'm sorry.

9         Q.    You said you heard a caddy fall.  What did you

10   do next?

11        A.    I turned around and looked and saw that there

12   was someone that was very upset and they were kind of --

13   other officers going over to talk to him.

14        Q.    When you say caddy, can you tell the Judge what

15   you mean by caddy?

16        A.    Caddy is a metal container that holds

17   condiments for the table and menus.

18        THE COURT:  Something that sits on top of the table.

19        THE WITNESS:  Yes.  It is circular and has like a

20   handle coming out of it so you can carry it from table to

21   table.

22   BY MR. DIBENEDETTO:

23        Q.    When you say you turned and you looked, what

24   did you see when you turned and looked?

139

1    Q.    Well, after you saw the African-American

2    gentleman do that, what is the next thing that you

3    noticed?

4    A.    That's when the off-duty officers became a

5    little bit more aggressive and started to be

6    confrontational.

7    MS. LIGHTFOOT:  Objection, your Honor.

8    THE COURT:  To what?

9    MS. LIGHTFOOT:  I object to the characterization of

10   aggressive and confrontational.

11   THE COURT:  You will have an opportunity to cross

12   examine her.  Objection overruled.

13   BY MR. DIBENEDETTO:

14   Q.    Please go on.

15   A.    And that's when the fight broke out.  The

16   gentlemen playing pool seemed like they didn't want.

17   Q.    Didn't want what?

18   A.    A confrontation.

19   Q.    Let me ask you this.  Up until the point when

20   the African-American gentleman put the pool balls in the

21   table, did you see the individuals that were playing

22   pool, did you see or hear them make any offensive

23   comments to the off-duty police officers that were in the

24   corner?

142

1    A.   No.

2    Q.   Did you see the individuals that were playing

3    pool make any aggressive physical action toward the

4    off-duty officers that were in the corner?

5    A.   No.

6    Q.   Okay.  After seeing the officers getting

7    aggressive, what is the next thing that you remember

8    observing?

9    A.   A fight broke out and I saw someone on the

10   ground.

11   Q.   Who did you see on the ground?

12   A.   I saw someone tall with dark hair.  I don't

13   remember who it was.

14   Q.   When you say that it seemed like to you that

15   the pool players didn't want to fight, what makes you say

16   that?

17   A.   You could tell they were trying to avoid it.

18   They were, you know, kind of have their hands up like

19   woe, woe, woe.

20   MR. DIBENEDETTO:  For the record, the witness just

21   had both of her hands up pointed toward the air.

22   Q.   And after seeing the individual that you

23   remember being on the ground what is the next thing that

24   you observed?

143

1      A.   I remember that we were just trying to get

2   people out of the bar and that parts of both parties were

3   inside and outside; that at some point we locked the door

4   because we had felt that we had gotten enough people out

5   that we felt kind of safe inside. And that's when the

6   incident happened in the vestibule where the taller of

7   the friends was getting beat up.

8      Q.   When you say the taller of the friends was

9   getting beat up, where was the taller of the friends

10   getting beat up?

11      A.   Inside the vestibule.

12      Q.   When you say inside the vestibule, are you

13   referring to inside the cloth entrance that you spoke to

14   the Judge about before?

15      A.   Yes.

16      Q.   Where were you standing at this point?

17      A.   I was standing outside of the glass door

18   looking straight inside.

19      Q.   Now, when you say outside of the glass door,

20   were you inside or outside of the bar proper?

21      A.   I was inside the bar.

22      Q.   From inside the bar what were you looking into?

23      A.   I was looking into the vestibule.

24      Q.   What separates the actual inside of the bar

1   proper from the vestibule?

2       A.   A glass door entrance.

3       Q.   Is it fair to say that you can see through the

4   glass?

5       A.   Yes.

6       Q.   When you were observing through the glass, what

7   specifically did you see?

8       A.   I saw him getting beat up, and I saw Jeff

9   Planey punching him in the face.

10      THE COURT:   You saw what?

11      THE WITNESS:   I saw Jeff Planey punching him in the

12  face.

13  BY MR. DIBENEDETTO:

14      Q.   Where inside the vestibule was Jeff Planey

15  punching the taller of the friends?

16      A.   He was pushing him up against the south brick

17  wall that's white inside the vestibule.

18      Q.   How many times did you see Jeff Planey punch

19  the larger of Scott's friends in the face or punch the

20  larger of Scott's friends?

21      A.   Two or three.

22      Q.   I'm sorry?

23      A.   Two or three.

24      Q.   And the entire time you were standing just

147

1    I don't know by who.

2         Q.   When you say you believe they were called as

3    well, how were those calls made?

4         A.   From a cell phone or from the bar phone.

5         Q.   Were you present when police did arrive?

6         A.   Yes.

7         Q.   What did you do when you saw police cars

8    arrive?

9         A.   I went outside and I gestured for them to come

10   inside and help with my hands like, you know

11   (indicating).

12        Q.   While you were outside gesturing to the police,

13   specifically show the Judge what you were doing?

14        A.   (Witness complies).

15        THE COURT:   She just did.

16        MR. DIBENEDETTO:   Let the record reflect that the

17   witness had her arms in front of her waving them away

18   from her body into her body.

19        THE COURT:   The record will so reflect.

20   BY MR. DIBENEDETTO:

21        Q.   As you were doing that and the police cars are

22   out there what did you observe?

23        A.   I observed them coming and I observed Officer

24   Planey telling them that things were under control and

149

1    that they could leave.  And then they turned around and

2    left.

3         Q.   How did you feel when the police cars left?

4         MR. NEEDHAM:  Objection to the relevance of her

5    feelings.

6         THE COURT:  Sustained.

7    BY MR. DIBENEDETTO:

8         Q.   What is the next thing you did after the police

9    cars left?  Let me ask you this.  Besides the police cars

10   did anybody else arrive?

11        A.   Jodi and Kevin arrived later.

12        Q.   Were you still at the bar when they arrived?

13        A.   Yes.

14        Q.   Tell the Judge -- can you describe to the Judge

15   what happened when Jodi arrived at the bar?

16        A.   Everybody was talking to her about what had

17   happened and she -- the pool players, they came back to

18   get inside the bar, and they were yelling at Jodi and

19   Kevin saying that they were going to sue them and they

20   were upset.  They were under the impression that the

21   officers worked for our bar.

22        Q.   At the time that you said they were yelling,

23   who specifically do you remember yelling at them?

24        A.   I don't remember specifically.  It was the one,

                                150

1     A.    Yes.

2     THE COURT:  Can you move that up and down at all, or

3  is that it, that frame is it?

4     MR. DIBENEDETTO:  No, Judge, I can't.

5     MR. NEEDHAM:  You can zoom, but it doesn't change

6  the borders.

7     THE COURT:  All right.

8     MR. DIBENEDETTO:  For what it is worth, later when

9  deliberating to zoom, you hit the plus button and then

10  you can hit it.

11     THE COURT:  But it doesn't expand the borders.

12     MR. DIBENEDETTO:  No.  For the record, starting on

13  Camera 1 at 3:46:11 running at half speed from People's

14  Exhibit 17.

15     Q.   Miss Martin, I ask you to take a look at your

16  monitor again.

17              (Video playing.)

18     Q.   Miss Martin, you talked about before how you

19  went out to the street waving your arms.  What is shown

20  where I stopped it at 3:46:14, from Camera 1 from

21  Exhibit 17?

22     A.   Me waving my arms.

23     Q.   Could you identify where you are out there by

24  placing a circle?

1      A.    Striped hooded sweatshirt and a jean skirt.

2      Q.    I would like you to continue watching.

3                  (Video playing.)

4    BY MR. DIBENEDETTO:

5      Q.    Now, stopping now at Camera 6 at 3:43:15,

6    running it at half speed, do you see yourself where you

7    are in that still shot?

8      A.    Yes.

9      Q.    Can you please draw a circle around yourself in

10   terms of where you are?

11     A.    (Witness complies.)

12     MR. DIBENEDETTO:   Judge, we would like that printed

13   and marked as People's Exhibit 34.

14     Q.    Now, in terms of the area of the bar you were

15   standing in when you saw the larger of Scott's two

16   friends get punched by Jeff Planey, is that the general

17   area you were standing that you just circled right now

18   when you saw it?

19     A.    Yes.

20     Q.    As you are sitting here right now, the exhibit

21   that has just been marked, are you capable of saying it

22   is at that exact moment you saw the punching or are you

23   just marking out the general area that you are watching

24   this from?

                              163

1       A.   It's at the exact moment.

2       Q.   Now, since the night of the incident until

3   today -- let me clarify.

4            Since the night of the incident until today

5   with respect to Scott and the two friends he was playing

6   pool with, have you had any conversations with them about

7   this case?

8       A.   No.

9       Q.   Earlier you were in the back during the break

10  with Barry Gilfand sitting back there, correct?

11      A.   Yes.

12      Q.   Did you speak to Barry Gilfand about this case

13  at all?

14      A.   No.

15      Q.   On the night of this incident, who else from

16  the bar staff, who else was at the bar on the night of

17  this incident?

18      A.   I'm sorry?

19      Q.   Bar staff-wise, who else was working on the

20  night of this incident?

21      A.   Melisa, Lindsay, Jessie, Dominico.

22      THE COURT:  Melisa, Lindsay?

23      THE WITNESS:  Jessie, Dominico and Joel I believe.

24

164