**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BARRY GILFAND, et al., | ) | |
| | ) | No. 07 C 2566 |
| Plaintiffs, | ) | |
| | ) | Judge Harry D. Leinenweber |
| v. | ) | |
| | ) | |
| SGT. JEFFREY PLANEY, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

**PLAINTIFFS' RESPONSE TO DEFENDANT OFFICERS'
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs, BARRY GILFAND, AARON GILFAND, ADAM MASTRUCCI, and SCOTT

LOWRANCE, through their attorneys, Smith, Johnson & Antholt, LLC, respond to the motions

for summary judgment by Defendant Officers Powers, Barnes, Planey, Matthews, Padilla, and

Kereakes, and by Defendants Responding Officers Kingsley, Carlyon, Collins, Mayoski, Pina,

Enriquez, Howe, Lupo, Morabito, as follows.

Amanda Antholt
Christopher Smith
Robert W. Johnson
James Baranyk
Smith, Johnson & Antholt LLC
112 S. Sangamon Street, 3rd Floor
Chicago, IL 60607
312.432.0400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………........ iv

INTRODUCTION ………………………………………………………………… 1

I.     SUMMARY OF FACTS …..…………………………………………… 2

      A.      Events Inside The Jefferson Tap & Grille …………………………………… 2

      B.      The Attacks Outside of the Jefferson Tap and In The Vestibule ……………….. 4

      C.      The Responding Officers Arrive, and Then Quickly Leave In An Effort To Protect Their Friends, the Off-Duty Officers ……………………………………… 5

      D.      The "Battery In Progress" Continued As the Responding Officers Fled ………... 7

II.     THE SUMMARY JUDGMENT STANDARD ………………………………………. 7

III.     DEFENDANT OFF-DUTY OFFICERS' MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF EXCESSIVE FORCE AND FAILURE TO INTEVENE MUST BE DENIED ……………………………………… 8

      A.      The Claims Against Each of the Officers Is Supported by Substantial Evidence …………………………………………………………… 9

      B.      Defendants' Credibility Arguments Must Be Rejected ………………………... 14

            1.      The Evidence Establishes That Barnes Broke Aaron Gilfand's Nose; Defendants Barnes and Powers' Effort to Make Officer Padilla the Scapegoat Fails ………………………………………….. 16

            2.      Defendants Fail To "Conclusively Establish" That A Punch Depicted On Video Did Not Occur ……………………………………………… 18

            3.      Defendants Misconstrue Statements and Testimony of Varying Detail as Inconsistent In Order to Create Impeachment ………………………… 19

            4.      The Officers Who Beat Barry Gilfand, or Failed to Intervene in the Beating, Outside of the Tap Have Been Identified ……………………... 20

            5.      Defendants' Confusion of the Vestibule and the Foyer Does Not Create an Inconsistency In Barry's Testimony …………………………. 21

6.  The Plaintiffs Did Not "Recant" Their Testimony Regarding Officer Barnes' Final Acts of Violence ………………………………………… 22

7.  Neither the Video Nor the Medical Evidence Contradicts Barry Gilfand's Description of the Beating …………………………………... 24

  (a)  Barry Did Not Approach Powers Following the Beating ……… 24

  (b)  That Barry Was Able to Walk and Carry His Coat Does Not Prove That He Was Not Hit or Kicked ………………………… 24

  (c)  Established Case Law Requires This Court to Reject Defendants' Arguments Regarding Barry's Injuries …………... 25

(8)  Defendants' Arguments At Best Constitute Points of Impeachment and Cannot Be Grounds for Summary Judgment ……………………… 28

IV.  DEFENDANTS RESPONDING OFFICERS' MOTION FOR SUMMARY JUDGMENT ON THE FAILURE TO INTEVENE CLAIM MUST BE DENIED …………………... 30

A.  Officer Mayoski and Pina Were Present and Failed to Intervene in the Excessive Force …………………………………………………………………... 32

B.  The Other Responding Officers Had the Knowledge and Opportunity Requiring Them to Intervene to Prevent the Harm To Plaintiffs ……………… 33

CONCLUSION ……………………………………………………………………………… 36

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Abdullahi v. City of Madison,* 423 F.3d 763 (7th Cir. 2005) ……………………………….. 8, 30, 33

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986) ………………………… 7

*Boyle v. Torres*, 756 F. Supp. 2d 983 (N.D. Ill. 2010) …………………………………………… 33

*Byrd v. Brishke*, 466 F.2d 6 (1972) ………………………………………………………….. 33

*Catlin v. City of Wheaton*, 574 F.3d 361(7th Cir. 2009) ……………………………………… 8

*Coble v. City of White House,* 634 F.3d 865 (6th Cir. 2011) …………………………………… 30

*Crowder v. Lash,* 687 F.2d 996 (7th Cir. 1982) ……………………………………………… 36

*E.E.O.C. v. International Profit Associates, Inc.*, 647 F. Supp. 2d 951 (N.D. Ill. 2009) ……… 29

*Fillmore v. Page,* 358 F.3d 496 (7th Cir. 2004) ……………………………………………... 36

*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009) …………………………………… 14, 26

*Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865 (1989) ……………………………………… 8, 9

*Hinks v. Graco, Inc.*, No. 91 C 5571, 1993 WL 350193, (N.D. Ill. Sept. 3, 1993) ……………. 28

*Johnson v. Moeller,* 269 F.App'x. 593 (7th Cir. 2008) ………………………………………… 27

*Lanigan v. Vil. of E. Hazel Crest,* 110 F.3d 467 (7th Cir. 1997) ……………………………... 33

*Lust v. Razzino*, No. 08-C-7346, 2010 WL 845942 (N.D. Ill. March 3, 2010) ………………... 26

*Miller v. Smith,* 220 F.3d 491 (7th Cir. 2000) ……………………………………………… 9, 20, 33

*Morfin v. City of E. Chicago*, 349 F.3d 989 (7th Cir. 2003) ………………………………... 33-34

*National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508 (7th Cir. 2008) ………. 28

*Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478 (7th Cir. 2007) …………………. 18

*Reed v. City of St. Charles, Missouri*, 561 F.3d 788 (8th Cir. 2009) …………………………. 29

*Schneider v. Love*, 09 C 3105, 2011 WL 635582 (N.D. Ill. Feb. 10, 2011) …………………… 29

*Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769 (2007) …………………………………… 14, 28, 30

*Smith v. Hunt*, 08 C 6982, 2010 WL 3842374 (N.D. Ill. Sept. 27, 2010) ……………………… 33

*Stainback v. Dixon*, 569 F.3d 767 (7th Cir. 2009) …………………………………………... 8-9

*Stamps v. Hernandez*, No. 08 C 2196, 2010 WL 3713686 (N.D. Ill. Sept. 14, 2010) …………. 28

*Washington v. Haupert* 481 F.3d 543 (7th Cir. 2007) ………………………………………… 29

*Yang v. Hardin,* 37 F.3d 282 (7th Cir. 1994) ……………………………………………….. 31, 36

*York v. City of Las Cruces*, 523 F.3d 1205 (10th Cir. 2008) …………………………………… 30

## INTRODUCTION

The unprovoked attacks against Plaintiffs by the off-duty Defendant Officers were caught on videotape. Throughout the events, the officers are seen hitting, pushing and punching Plaintiffs. Sgt. Planey is caught on-camera twice slamming Barry Gilfand off his feet and into walls by his throat. Non-party eye-witnesses have also testified to the officers' violence, including when Officer Barnes broke Aaron Gilfand's nose. The motions for summary judgment by the off-duty officers defy well-established law by asking this Court to make findings of credibility based on arguments that are at best impeachment, but more often than that exaggerated and manufactured inconsistencies.

The motion for summary judgment by the Responding Officers fares no better. These officers were assigned to respond to a "hold-up alarm" and "battery in progress" at a downtown bar. They arrived on the scene where Barry Gilfand was screaming for help, Officer Barnes was walking around covered in Aaron's blood and the bar employees were requesting help. Once they learned that their fellow officers were involved in the "battery in progress" they turned their cars around and left, protecting the off-duty officers and allowing their violence to continue. Indeed, Responding Officers Mayoski and Pina – after being told by Officer Barnes that he and his teammates were involved – are shown on the video turning their car around and slowly driving by Plaintiffs and the off-duty officers while the final incident of excessive force was occurring.

Overwhelming evidence establishes that the Plaintiffs were violently attacked by the off-duty officers and that the on-duty officers chose to help those officers (by turning away) instead of the victims that they were dispatched to assist. All of the officers' motions for summary judgment should be denied.

1

## I.     SUMMARY OF FACTS

### A.     Events Inside The Jefferson Tap & Grille

In the early morning hours of December 15, 2006, Plaintiffs Scott Lowrance, Adam Mastrucci, Aaron Gilfand, and Barry Gilfand[1] were playing pool at the Jefferson Tap & Grille. (Plaintiffs' Local Rule 56.1(b)(3)(B) Stmt. of Add'l Facts ("LR Stmt.") ¶1.) Around the time of "last call," Plaintiffs received permission from the bar staff to play one more game of pool. (*Id.*)

A group of off-duty police officers, Jeffrey Planey, Gregory Barnes, Vincent Matthews, Paul Powers, Matias Padilla, Demetrios Kereakes, and Erika Woosley[2] were also patrons in the bar. (*Id.* ¶2.) These officers worked together on the Area Gun Team, and had attended a holiday party earlier that night. (*Id.* ¶3.) After the party, the officers continued drinking with rounds of beer and shots at the Jefferson Tap. (*Id.*) During the night and early morning, Powers was upset; at times he was crying and at times he appeared angry. (*Id.* ¶4.) At one point he pushed a table in the bar, knocking over a caddy. (*Id.*)

Around 3:34 a.m., Officer Matthews took Officer Powers' gun away from him and held onto it for the remainder of the night. (*Id.* ¶5.) Moments later, the officers approached the front of the bar and clustered around Plaintiffs in a hostile manner. (*Id.* ¶¶6, 8.) Prior to this point, Plaintiffs had been focused on their own group and not interacted with the Defendants. (*Id.* ¶7.) Plaintiffs had not been laughing at or even paying attention to Powers who had been in the back of the bar. (*Id.*)

---

[1] Henceforth, Plaintiffs will be referred to individually by their first names.

[2] Defendants Planey, Barnes, Matthews, Powers, Padilla, Kereakes, and Woosley are referred to collectively as "off-duty officers" or "Defendant Officers."

2

The officers immediately became confrontational and aggressive toward Plaintiffs. (*Id.* ¶¶9-10.) Officer Matthews reached across the pool table, sweeping the balls into the pockets, telling Plaintiffs, "game is over." (*Id.* ¶11.) Officer Padilla reached across the table and took the pool cue away from Barry. (*Id.* ¶12.) Officer Powers tried to "shoulder" Scott and then walked around the table and got in Barry's face. (*Id.* ¶¶10, 13.) Officer Barnes approached Aaron and Adam. (*Id.* ¶16.) As Aaron saw and reacted to what was happening between the other officers and his brother, Officer Barnes turned him away from the pool table (where Barry was located). (*Id.*) These events are captured on the video recording. (*Id.* ¶¶8, 10-13, 16.)

According to non-party witnesses (in addition to Plaintiffs), as all of this was happening, the Plaintiffs were shocked and tried to avoid any confrontation. (*Id.* ¶¶7, 9.) Emily Martin described Plaintiffs putting their hands up and saying something like "woe, woe, woe." (*Id.* ¶9.) Witness Lindsay Vanderford heard Scott saying, "relax, and what's going on?" (*Id.* ¶15.) At no point did Plaintiffs make any threats or aggressive or threatening movements. (*Id.*)

When Scott saw officers surrounding Adam and Aaron, he told them, "We don't want any trouble here. We're not looking for trouble." (*Id.* ¶14.) Sgt. Planey, however, approached the group, grabbed Aaron from behind and pulled him down to the ground, choking him the in process. (*Id.* ¶¶16-17.) Officer Powers rushed around the pool table to punch Aaron, who lay on the ground. (*Id.* ¶18.) Meanwhile, Officer Barnes hit Adam on the left temple, knocking him to the ground. (*Id.* ¶19.) All of these actions are captured on the video. (*Id.* ¶¶17-19.)

When Scott saw what the officers were doing to Aaron, he called out "Hey come on." (*Id.* ¶21.) Sgt. Planey and Officer Padilla then grabbed him, pushed him onto the pool table and then knocked him to the ground. (*Id.* ¶¶22.) Their force was so powerful that the entire pool table moved. (*Id.*) Scott was choked and hit in the eye. (*Id.* ¶23.) Scott is blind in one eye, and when he

3

tried to open his good eye he could not see anything. (*Id.* ¶24.) For a moment, he thought that he had gone completely blind; he then lost consciousness. (*Id.*)

Adam saw Scott get hit and tried to get to him, but one of the Defendant Officers stopped him by hitting or pushing him. (*Id.* ¶25.) The video shows Officer Kereakes shoving Adam back in a hitting or pushing motion. (*Id.*)

When Aaron got up from the floor, he attempted to go toward his friends but Officer Matthews took him by the shirt and shoved him against the barstools near the video game machines. (*Id.* ¶26.) After a moment, Aaron again attempted to go check on Scott, who was leaning against the other side of the pool table. (*Id.* ¶27.) Officer Matthews again shoved him and struck him in the throat. (*Id.*) Again, Plaintiffs' description of these events is corroborated by the video. (*Id.*)

After attacking Scott, Sgt. Planey turned his attention to Barry. (*Id.* ¶¶29-30.) He told Barry to get out of the bar. (*Id.* ¶29.) Barry just kept saying, "[t]hat's my brother" and "I don't know what's going on here." *(Id.)* Sgt. Planey then used physical force to push Barry out of the bar. (*Id.* ¶30.) Near the doorway, Sgt. Planey slammed Barry against the wall by his throat. (*Id.*) He lifted Barry off the ground, choking him. (*Id.*) Officer Powers stood at Sgt. Planey's side, and Officers Woosley and Padilla were within a few feet of them. (*Id.* ¶¶31-32.) These events were also captured on video, as well as described in detail by two non-party witnesses. (*Id.* ¶29.)

### B. The Attacks Outside of the Jefferson Tap and In The Vestibule

Barry took out his cell phone to try to call for help, but before he could do so Sgt. Planey ran over, grabbed him by the throat and slammed him against the wall. (*Id.* ¶¶34, 37.) Sgt. Planey took Barry's cell phone from him. (*Id.* ¶36.) Officer Powers followed Sgt. Planey outside, and they both struck Barry. (*Id.* ¶¶35, 37.) Sgt. Planey then walked away, but other off-duty officers

4

exited the bar and joined Powers. (*Id.* ¶¶37.) Barry was repeatedly struck by officers within this

group. (*Id.* ¶¶35, 37.) Although Barry cannot identify the particular officer who struck him at this

point (because he had covered his head with his jacket), the video establishes that Officers

Kereakes, Barnes, Matthews and Powers were present at this point and location. (*Id.* ¶38.)

When Adam and Aaron came out of the bar looking for Barry, Sgt. Planey blocked both

from leaving the vestibule. (*Id.* ¶¶39-41.) The other officers rushed back into the vestibule and

Adam and Aaron were both struck repeatedly by multiple officers. (*Id.* ¶42-43.) Officer Padilla

has admitted to punching one of the Plaintiffs in the vestibule. (*Id.* ¶43.) Non-party witnesses

saw Sgt. Planey and Officer Barnes punch Aaron. (*Id.* ¶¶43-44.) Aaron specifically remembers

Officer Barnes punching him directly in the nose, breaking it and causing blood to flow. (*Id.* ¶45)

Melissa Smith testified that she first saw blood at some point while they were shoving and

pushing in the vestibule, "that's when the blood came onto the window and the ground." (*Id.*

¶46.) Officer Barnes was in the vestibule with Aaron for approximately four minutes during

which time the on-duty Responding Officers began to arrive on the scene. (*Id.* ¶48.)

### C. The Responding Officers Arrive, and Then Quickly Leave In An Effort To Protect Their Friends, the Off-Duty Officers

Following several 911 calls, a number of dispatches went out on the CPD radio regarding

this incident including that there was a "hold up alarm" at the cash register, a "big old fight" and

a "battery in progress," and "25 people are fighting." (Responding Officer Defendants Statement

of Facts ("ROD Facts") ¶12.) Officers Mayoski, Pina, Collins, Lupo, Carlyon, Morabito and Sgt.

Kingsley (referred to collectively as "Responding Officers")[3] responded to those dispatches. (LR

Stmt. ¶50.)

---

[3] Plaintiffs agree to dismiss Responding Officer Defendants Howe and Enriquez from this matter.

5

Barry told Officers Collins and Lupa: "we are being attacked," and "I don't know what is happening. Help us." (*Id.* ¶54.) He told them, "my brother is in there" and he pointed to the vestibule where his brother lay bleeding. (*Id.* ¶¶52, 54.) Once the officers spoke to Sgt. Planey, however, they rushed to leave. (*Id.* ¶55.) The video shows that Officer Collins actually slammed Barry's coat in the door as he ignored Barry's pleas for help. (*Id.*)

The Jefferson Tap employees and owner also requested that the Responding Officers assist them to no avail. (*Id.* ¶53.) After bar employee Lindsay Vanderford and owner Jodi Agee asked Officers Pina and Mayoski for help and received no response, Officer Barnes approached the officers. (*Id.* ¶¶53, 61.) Aaron's blood was on Barnes' shirt, and Officer Mayoski asked him (Barnes) if he was injured. (*Id.* ¶62.) He explained that they had been involved in a fight in the bar: he told them that there had been a "scuffle" and that "some guys were picking on Paul and it escalated to push, shove." (*Id.* ¶61.) After talking to these officers, Barnes walked south to where the Plaintiffs were located and Barry was screaming. (*Id.* ¶¶63-64, 66.) Officers Barnes told Plaintiffs, "you better shut him the fuck up." (*Id.* ¶64.) He then grabbed, shoved, and pushed Aaron, who was begging him to just leave them alone. (*Id.* ¶67.) As Officer Barnes attacked Plaintiffs, Officers Mayoski and Pina turned their car around and drove right past the group without doing anything to help Plaintiffs. (*Id.* ¶¶67-68.)

During and immediately following the events, Responding Officers Mayoski and Kingsley also had telephone contact with the off-duty officers. (*Id.* ¶¶71-72.) According to Officer Mayoski's cell phone records, there were four phone calls between her and Officer Barnes that morning, one lasting seven minutes. (*Id.* ¶71.) Prior to the discovery into their cell phone records, Sgt. Kingsley testified that he had not spoken with anyone. (*Id.* ¶73.) Sgt.

Kingsley's cell phone records, however, indicate that there were three phone calls between Sgt. Planey and him that morning between 3:54 a.m. and 4:55 a.m. (*Id.* ¶72.)

When responding to a "hold-up alarm," Chicago police officers are trained to exit their vehicles, assess who is inside and outside, and interview people around the location. (*Id.* ¶73.) When responding to a "battery in progress" call, Chicago police officers are trained to interview people at the scene of the call to find out whether in fact a battery had taken place. (*Id.* ¶74.) The Responding Officers, however, did not do any of these things.

### D.     The "Battery In Progress" Continued As the Responding Officers Fled

As the Responding Officers left the area, the Plaintiffs were several doors south of the Jefferson Tap in front of Scott's condo. (*Id.* ¶63.) Barry was hysterical and still screaming for help. (*Id.* ¶64.) When Officer Barnes came towards Barry, Aaron begged him, "please don't, please stop." (*Id.* ¶67.) Officer Barnes grabbed and shoved Aaron. (*Id.*) One of the bar owners, Kevin O'Janovac, approached the group and saw the pushing and shoving. (*Id.*) Around this time, Sgt. Planey and Officer Matthews also joined the group. (*Id.* ¶¶68-69.) Plaintiffs were able to run away and get into the lobby of Scott's building. (*Id.* ¶70.) They were chased by Officer Matthews, who grabbed the door hard and tried to get in. (*Id.*) Luckily, the door was locked and the attacks were finally over. (*Id.*)

## II.     THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56. All facts must be construed in a light most favorable to the non-moving party and all reasonable inferences must be drawn in Plaintiffs' favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).

Here, the Court previously denied all Defendants' motions for summary judgment on the issue of "color of law" on December 2, 2009. *See* Dckt. No. 164. That issue having been decided, the only issue before this Court is whether there is sufficient evidence of Plaintiffs' excessive force and failure to intervene claims.

## III.    DEFENDANT OFF-DUTY OFFICERS' MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF EXCESSIVE FORCE AND FAILURE TO INTEVENE MUST BE DENIED

The evidence – both through Plaintiffs' own testimony, as well as that of third party witnesses and the video recording – overwhelmingly supports the excessive force and failure to intervene claims. Every one of the Defendant Officers moves for summary judgment even those whose acts of violence were caught on videotape and described by non-party witnesses. Their motions for summary judgment are based on improper credibility arguments, they misapply the law, and they should be denied.

Excessive force used by police during a seizure of a citizen is assessed under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, (1989); *Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir. 2005). The Seventh Circuit has repeatedly warned that "since the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009) citing *Abdullahi,* 423 F.3d at 768.

"Assessing whether the force used to effectuate a particular seizure is reasonable 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Stainback v.*

8

*Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (quoting *Graham*, 490 U.S. at 396)). Here, Defendants had no basis for using any force against Plaintiffs. (LR Stmt. ¶¶7, 9, 14-15.) Defendants do not argue that their violence was reasonable, but instead untenably ask the Court to disregard their use of excessive force, along with Plaintiffs' testimony and that of the witnesses.

Furthermore, as set forth below, for most of the acts of violence by particular officers, others stood by and allowed it to occur. These officers had an opportunity to prevent the harm, but failed to do so, and as a result they too are responsible. An officer, who had "a realistic opportunity to step forward and prevent a fellow officer from violating the plaintiff's rights through excessive force but failed to do so" may be held liable. *Miller v. Smith,* 220 F.3d 491, 495 (7th Cir. 2000).

## A. The Claims Against Each of the Officers Is Supported by Substantial Evidence

Each of the Defendant Off-Duty Officers may be held liable for his own use of force, as well as for failing to intervene in the excessive force by the other officers. In light of the witness testimony and video evidence of these officers punching, shoving, choking and knocking down Plaintiffs, all of the motions are without merit. Indeed, it is difficult to say which of the officers' motions is the most frivolous: Sgt. Planey surely wins the prize in light of the number of times that he was captured on video using excessive force; however, Padilla's admission of punching one of the Plaintiffs and the eye-witness testimony of Barnes breaking Aaron's nose makes it a close call.

As set forth for each of the officers' below, their actions as well as their inaction in failing to intervene are well supported by ample credible evidence.

### *Sgt. Planey*:

Sgt. Planey used excessive force by doing the following:

(1)     Choking Aaron and pulling him down to the ground (LR Stmt. ¶¶16-17);

(2)     Pushing and choking Scott (*Id.* ¶¶22-23);

(3)     Pushing Barry to the door, grabbing him, choking him and lifting him off the ground in the foyer of the bar (*Id.* ¶¶30-31);

(4)     Slamming Barry against the wall outside the bar (*Id.* ¶¶34, 37);

(5)     Hitting and kicking Barry (*Id.* ¶35); and

(6)     Pulling Aaron into the vestibule, slamming him against the wall and punching him (*Id.* ¶¶40-41, 43-44).

In addition to his own use of excessive force, Sgt. Planey failed to intervene in the excessive force by the other officers. He was inside the bar with Officers Powers, Barnes, Padilla, Kereakes and Matthews when they each used excessive force against Plaintiffs. (*Id.* ¶28.) He was in the vestibule when other officers punched Aaron and Adam. (*Id.* ¶¶42-43.) He was close by when Officer Barnes grabbed, shoved and pushed Aaron as Responding Officers Mayoski and Pina were leaving the scene. (*Id.* ¶¶67-68.) In each of these situations Sgt. Planey had the opportunity to prevent the excessive force but failed to do so.

### *Officer Powers*:

A jury could easily find that Officer Powers used excessive force when he ran around the pool table to punch Aaron as he lay on the floor after having been pushed by the other officers. (*Id.* ¶18.) Likewise, hitting and kicking Barry outside of the bar constitutes excessive force. (*Id.* ¶35.) Officer Powers could also be held liable for failing to intervene in the multiple instances of excessive force by his teammates that he stood by and watched. Officer Powers had an opportunity to intervene to prevent the harm from occurring but failed to do so during: the uses

10

of excessive force by Sgt. Planey and Officers Barnes, Padilla, Kereakes and Matthews inside the bar (*id.* ¶¶28, 31); the excessive force by Sgt. Planey and other officers against Barry outside of the bar (*id.* ¶¶35, 37-38); and the excessive force in the vestibule when the other officers punched Aaron and Adam (*id.* ¶¶42-43).

### ***Officer Barnes***:

Video and witness testimony substantiates that Officer Barnes used excessive force when he: (1) hit Adam in the head by the pool table (*id.* ¶19); (2) pushed one of the plaintiffs inside the bar (*id.* ¶¶20); (3) punched Aaron in the vestibule (*id.* ¶¶43, 45); and (4) grabbed, shoved and pushed Aaron outside and to the south of the bar (*id.* ¶67.)

Officer Barnes failed to intervene in the multiple instances of excessive force by his teammates in that he stood by and watched. Officer Barnes was inside the bar when Sgt. Planey and Officers Powers, Padilla, Kereakes and Matthews used excessive force against Plaintiffs in the area around the pool table and the foyer. (*Id.* ¶¶16, 28.) Officer Barnes was inside the vestibule when other officers were punching Aaron and Adam. (*Id.* ¶¶42-43.) Also, after he first exited the bar, Officer Barnes hit and/or kicked Barry, or failed to intervene in other officers' use of excessive force against Barry. (*Id.* ¶¶35, 37-38.)

### ***Officer Padilla***

A reasonable jury could find that Officer Padilla used excessive force based on his own admission that he punched one of the Plaintiffs in the vestibule (*id.* ¶43) as well as based on the video showing him help Sgt. Planey to push Scott onto the pool table, punch Scott in the head and then to the ground (*id.* ¶¶22-23). Officer Padilla could also be held liable for failing to intervene in the multiple instances of excessive force by his teammates that he stood by and watched. Officer Padilla was present for the uses of excessive force by Sgt. Planey and Officers

11

Barnes, Powers, Kereakes and Matthews inside the bar. (*Id.* ¶¶28, 32). He was present in the vestibule when other officers were also punching Aaron and Adam. (*Id.* ¶¶42-43.) In none of these incidents did Officer Padilla do anything to prevent the excessive force.

In his brief, Sgt. Planey argues that when he choked Barry slamming him into walls and punched Aaron he was only trying to help. Mem. Dckt. No. 252 at 11, 19. Defendants are free to make this argument to the jury at trial, but based on the video, the witness testimony and Plaintiffs' testimony only indicate that Sgt. Planey was attacking, not helping Barry.

### *Officer Kereakes*:

Officer Kereakes used excessive force when he hit Adam inside the bar, as is shown on the video as well as described by Plaintiff. (*Id.* ¶25). Officer Kereakes could also be held liable for failing to intervene in the multiple instances of excessive force by his teammates that he stood by and watched. Officer Kereakes was present for the uses of excessive force by Sgt. Planey and Officers Barnes, Powers, Padilla and Matthews inside the bar. (*Id.* ¶28.) After exiting the bar, Officer Kereakes either hit and/or kicked Barry, or failed to intervene in other officers' use of excessive force against Barry. (*Id.* ¶¶35, 37-38.) He was present in the vestibule when other officers were punching Aaron and Adam. (*Id.* ¶¶42-43.) In none of these incidents did Officer Kereakes do anything to prevent the excessive force.

Defendants argue that Defendant Kereakes should be dismissed because at this deposition Barry did not know who Demetrius Kerereakes was. *See* Mem. Dckt. No. 252 at 12. The fact that some of the Plaintiffs did not know this man by name does not mean that he was not involved. Adam's testimony and the video make clear that Officer Kereakes was very much involved in this incident.

### *Officer Matthews:*

Officer Matthews used excessive force when he shoved and hit Aaron inside the bar (*Id.* ¶¶26-27) and when he pushed Barry away from the vestibule (*Id.* ¶49). When he exited the bar, Officer Matthews either hit and/or kicked Barry, or failed to intervene in other officers' use of excessive force against Barry. (*Id.* ¶¶35, 37-38.) Officer Matthews could also be held liable for failing to intervene in the multiple instances of excessive force by his teammates that he stood by and watched. Officer Matthews was present for the uses of excessive force by Sgt. Planey and Officers Barnes, Powers, Padilla and Kereakes inside the bar. (*Id.* ¶28). He was present in the vestibule when other officers were punching Aaron and Adam. (*Id.* ¶¶42-43.) He was close at hand when Officer Barnes grabbed, shoved and pushed Aaron as Responding Officers Mayoski and Pina were leaving the scene. (*Id.* ¶¶69.) Despite having ample opportunity, time and again Officer Matthews failed to do anything to prevent the excessive force.

### *Officer Woosley*:

Throughout the video, Officer Woosley is shown standing, watching, and doing nothing in response to her fellow officers attacking Plaintiffs. While true that Officer Woosley never herself used excessive force, there is ample evidence that would allow a jury to hold her liabile for failure to intervene. Officer Woosley was in the bar and standing within a few feet from Sgt. Planey and Officers Powers, Barnes, Padilla, Kereakes and Matthews when they used excessive force against Plaintiffs. (*Id.* ¶¶28, 32). Officer Woosley was in the vestibule as the other officers repeatedly punched Aaron and Adam. (*Id.* ¶¶42-43.) Officer Woosley failed to take any steps to prevent these abuses when she had the opportunity to do so.

### B.     Defendants' Credibility Arguments Must Be Rejected

Some cases present unique circumstances that allow the courts to find that a party's testimony is not credible. Most importantly, this occurred in *Scott v. Harris* where the undeniable video evidence of a police pursuit resoundingly <u>contradicted</u> the claims of the plaintiff regarding that pursuit. Here, the opposite is true: a video <u>corroborates</u> the plaintiffs' account of the events. The fact that some of the Defendants' actions – including the beating that resulted in Aaron's broken nose – occurred out of the camera's sight cannot be used against Plaintiffs where everything that the video does show supports Plaintiffs. In light of the evidence in this case, it would be highly improper for the Court to make the credibility determinations that Defendant Officers seek. *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) ("We do not judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact.").

In *Scott v. Harris,* the plaintiff led the police on a ten minute chase at speeds exceeding 85 miles per hour. 550 U.S. 372, 375, 127 S.Ct. 1769, 1773 (2007). The plaintiff's account of driving within the speed limit and carefully obeying traffic laws was undeniably refuted by a video recording of the chase. *Id.* at 378-79. "Far from being the cautious and controlled driver the lower court depicts, what we see on the video more close resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380. The Court described the plaintiff's account of the chase as a "visible fiction" and ruled that at summary judgment the undisputed facts should be considered in light of the depiction on the video tape. *Id.* at 380-81.

In contrast, the video in this case corroborates each of the Plaintiffs' accounts. It shows the officers pushing, grabbing, hitting and slamming Plaintiffs while Plaintiffs cower and plead

14

with the officers. (LR Stmt. ¶¶17-19, 22, 25-27, 30, 37, 49.) Even for the instances of violence
that occurred off-camera, the video depictions of the officers' movements in and out of the
camera's sights corroborate the Plaintiffs' account. (*Id.* ¶¶37, 42, 44, 63, 68-69.) Defendants ask
this Court to cherry-pick through Plaintiffs' voluminous testimony and numerous statements
over the last five years to find inconsistencies among them and with their medical records. In
light of the video showing at least eight instances of excessive force, the testimony of non-party
witnesses describing the violence in the vestibule and on the street, and Plaintiffs' testimony of
the officers' violence, this is not a case like *Scott* where "opposing parties tell two different
stories, one of which is blatantly contradicted by the record, so that no reasonable jury could
believe it." *Id.* at 380-381.

Throughout their statement of facts and argument, Defendants blatantly manipulate the
record in order to create and exaggerate inconsistencies. Many of the arguments – including
those relating to Plaintiffs' finances, their retention of counsel and their failure to immediately
cooperate with the police after being beaten up and abandoned by the police – are so far from
appropriate for summary judgment consideration that they do not merit, or require, any response.
For example, Defendants start their brief by arguing that Barry lied during his deposition because
he denied any other "major problems" with the police when in fact he had warrants for his arrest
at the time. *See* Def. Mem., Dkt. 250 at 3, n.2. Those warrants were for failing to appear in court
on tickets for 1998 citations relating to underage alcohol and tobacco. (Defs. Ex. 20). Far from
"lying," the more rational explanation is that Barry did not consider getting citations relating to
underage drinking and smoking tobacco to be a "major problem" with the police (especially in
the context of a police brutality case).

While many of Defendants' other arguments at least relate to the events at issue in this case, few have any more merit – even as points of cross-examination and impeachment – than the Defendants' ridiculous contention that an underage drinking ticket would be considered a "major problem" with the police. Consistently throughout their brief, Defendants misconstrue the record to create misleading or exaggerated points of impeachment. None of these points come anywhere close to "conclusively establishing" that Defendants did not use excessive force in this case. Despite the lack of merit, Plaintiffs address Defendants' primary arguments.

**1.  The Evidence Establishes That Barnes Broke Aaron Gilfand's Nose; Defendants Barnes and Powers' Effort to Make Officer Padilla the Scapegoat Fails**

The fact that Officer Padilla hit one of the Plaintiffs does not establish that Officer Barnes did not punch Aaron in the nose. That Officer Barnes broke Aaron's nose is supported by Aaron's testimony, by witness Lindsay Vanderbilt's testimony and by the fact that Aaron's blood was on Barnes' shirt. (LR Stmt. ¶¶43, 45-46, 62.) At 3:43 a.m., the eight Defendant Off-duty Officers crowded into the vestibule of the Jefferson Tap. (*Id.* ¶42.) Both Aaron and Adam were repeatedly struck by multiple officers at multiple angles. (*Id.* ¶43.) One of those punches came from Officer Barnes. (*Id.* ¶45.) Aaron saw Officer Barnes' punch coming directly at his face. (*Id.*) He was hit in the nose and blood rushed out. (*Id.*)

Without any evidentiary support whatsoever, Defendants argue that it was Padilla, and not Barnes, who broke Aaron's nose. *See* Def. Mem., Dkt. 250 at 7, 17-18, 34-37.  First, this argument fails because it is premised on the false assumption that Aaron was only hit once in the vestibule. Aaron was punched repeatedly by several of the officers, including both Sgt. Planey and Officers Barnes. (LR Stmt. ¶¶43-45.)

16

Second, this argument also fails because it is not established by the testimony cited. Officer Padilla admitted at his deposition that he punched someone, but the cited testimony does not identify who he punched and Officer Padilla specifically testified that he did not know where on the person's body his punch landed. (*Id.* ¶81.) Moreover, he did not see any blood resulting from that punch. (*Id.)* Defendants Barnes and Powers also cite to Sgt. Planey's testimony in which he states that Padilla told him that he was the one who threw the punch. *See* Def. Mem., Dkt. 250 at 37 citing Defs' Stmt. of Facts, ¶18. On the following page of cited testimony (not included by Defendants), Planey explains that Padilla told him that he hit someone, but "I don't know if it was specifically Aaron." (LR Stmt. ¶81.) While we <u>assume</u> that Officer Padilla punched either Adam or Aaron in the vestibule, this evidence does not contradict the evidence establishing that it was Barnes' punch that broke Aaron's nose.

Furthermore, Defendants' attempt to impeach the testimony of eye-witness Lindsay Vanderford is incredibly misleading. *See* Def. Mem., Dkt. 250 at 18, 34-35. At the criminal trial, the defense showed Ms. Vanderford a small portion of the video in which Ms. Vanderford is seen watching and then turning away from the vestibule. (Defs. Ex. 37 at 99.) Ms. Vanderford testified that this was when she saw Barnes punch Aaron. (*Id.* at 100.) Defense counsel then used the video to demonstrate that Barnes was not in the vestibule at that exact moment. (*Id.* at 100-102.) The defense was then able to have Ms. Vanderford admit that she could be mistaken since Officer Barnes could not have been in two places at once. (*Id.* at 102-103.)

Ms. Vanderford was mistaken, but not about the punch. She was mistaken about the exact timing. The video shows – but the defense did not play it for her at the criminal trial – that Ms. Vanderford continued to watch the vestibule after *momentarily* turning away, including during the much longer period of time when Officer Barnes was in the vestibule. (LR Stmt. ¶¶47-48.)

17

Defense counsel manipulated the video evidence and this witness. Ms. Vanderford could have seen Officer Barnes punch Aaron in the nose – as Aaron also describes in vivid detail – at any time in the subsequent minutes that Lindsay was watching the vestibule and Barnes was undisputable in the vestibule. (*Id.*)

### 2.   Defendants Fail To "Conclusively Establish" That A Punch Depicted On Video Did Not Occur

The fact that Defendants are able to pick through the hundreds of pages of testimony and statements that Plaintiffs have given over the last five years to find some inconsistencies does not allow this Court to throw out the substantial evidence that Officer Powers punched Aaron as he lay helpless on the floor of the Jefferson Tap. *See e.g., Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 488 (7th Cir. 2007) (listing numerous reasons why changed or different testimony can be reasonably explained including by a change in circumstances, a lapsed memory, new information coming to light or by ambiguous or incomplete earlier testimony). Defendants' argument that the record defeats Aaron's testimony (Def. Mem., Dkt. 250 at 8, 17, 24) must be denied. Not only does Aaron's testimony establish that he was punched after being knocked to the ground, but the video establishes that it was Officer Powers who punched him. The video shows Paul Powers rushing around the pool table to swing his closed fist in exactly the direction and location where Aaron's head was located. (LR Stmt. ¶18.)

In support of their argument, Defendants claim that Aaron testified at the criminal trial that the man who stood over him (which man standing over him is not clear) did nothing. *See* Def. Mem., Dkt. 250 at 24 (citing Defs. Stmt. of Facts ¶42). The cited testimony actually states that when Aaron was on the ground something hit him in the head, but he did not know what. (Defs. Ex. 37 at 182.) The video shows what hits his head – it is Paul Powers' fist.

18

### 3. Defendants Misconstrue Statements and Testimony of Varying Detail as Inconsistent In Order to Create Impeachment

Defendants' arguments about Barry's so-called "changing story" (Def. Mem., Dkt. 250 at 10-11, 22-23; Mem. Dckt. No. 252 at 6-7, 17-18)[4] is refuted by the testimony cited. The statements are not inconsistent; they are simply differing levels of detail. The first statement cited is a two-page summary of an interview. (Defs. Ex. 25.) Obviously the summary does not contain all the detail of Barry's 465-page deposition from this case. The second is the deposition from the dramshop case, which was more detailed than the two-page summary but significantly less detailed (at only 100 pages) than the deposition in this case. Similarly, Officer Matthew's argument that Aaron's description of him is not include in the SOA summary report of his interview (Mem. Dkt. No. 252 at 13) fails to establish, or even contradict, the other evidence implicating Officer Matthews, including Plaintiffs' testimony and the video.

Defendants' characterizations of so-called inconsistencies are highly misleading. For example, Defendants claim that in his dramshop deposition Barry did not mention the attack outside of the bar and did not identify Officer Powers. *See* Def. Mem., Dkt. 250 at 22. This assertion is false. In the cited testimony, Barry described that a group of officers struck him after Sgt. Planey slammed him into a wall outside of the Tap. (Def. Ex. 18 at 57-58.) Defendants also argue that Officer Powers was not identified as being involved. *See* Def. Mem., Dkt. 250 at 22. The cited testimony (Defs. Ex. 18, at 54-55, 57-58) again defeats Defendants' argument. Barry did not make any identifications because he was not asked to at this point in his deposition. (*Id.*)

---

[4] Two sets of Defendant Off-Duty Officers have filed separately for summary judgment. *See* Docket Nos. 250 (Defendants Powers and Barnes) and 252 (Defendants Planey, Kereakes, Matthews, Padilla, and Woosley). Their briefs are substantially the same and include many identical arguments and cite to the same facts. Throughout this brief when generally referencing arguments made by both sets, Plaintiffs cite to both memorandums (as here). However, when discussing the details of certain arguments – for the sake of efficiency – Plaintiffs simply include full citations to one or other.

19

The fact that the questioner did not ask Barry to identify the officers were that were striking him does not create an inconsistency with later statements in which Barry was asked to and did identify those officers.

> **4.      The Officers Who Beat Barry Gilfand, or Failed to Intervene in the Beating, Outside of the Tap Have Been Identified**

After both Sgt. Planey and Officer Powers struck Barry, Sgt. Planey took Barry's cell phone—preventing him from calling for help—and walked away. (LR Stmt. ¶¶34-37.) Officer Powers remained. (*Id.* ¶37.) The video establishes that Powers was quickly joined by Officers Kereakes, Barnes, Matthews and Padilla. (*Id.*) Barry has consistently testified that he was struck by more than one of these officers. (*Id.* ¶35.) Even if he cannot establish who exactly among this group threw a punch or kicked him as crouched down hiding under his jacket, they are all liable for failure to intervene in the excessive force. In *Miller v. Smith*, the plaintiff was hit by one of two officers while he was face down on the ground. Although he could not identify which officer struck him, the Seventh Circuit overturned summary judgment for the officers. 220 F.3d 491, 495 (7th Cir. 2000) ("If, as we are required to do at this point in the case, [the plaintiff's] allegations are taken as true, whichever officer was not directly responsible for the beating was idly standing by. If [the plaintiff] can show at trial that an officer attacked him while another officer ignored a reasonable opportunity to intervene, he can recover.").

Defendants argue that the Court should make a credibility finding on this disputed fact because Defendants claim that "at the criminal trial, Barry Gilfand was completely unable to identify anyone in the group of people he claimed later attacked him outside of the JTAG and did not claim it was initiated by Powers." *See* Def. Mem., Dkt. 250 at 10 (citing to Defs. Stmt. Facts ¶59). This argument cites to Barry's testimony on pages 247 to 250 of the criminal trial. Notably

excluded are the two prior pages in which Barry testified that after Sgt. Planey walked away, Barry tried to run away from Officer Powers and screamed for help. (LR Stmt.¶35.) In the cited pages, Barry is then asked to describe what is happening <u>in the video</u> at this time and he describes that the video shows a group of officers walking towards him. *See* Defs. Stmt. Facts ¶59 citing Defs. Ex. 38 at 247-250. At no point in this portion of his testimony was he asked to identify the officers who beat him up. (*Id.*) On page 243 of his trial testimony – again, excluded from Defendants' description of his testimony – Barry had described what happened to him when he was pushed north of the Tap and out of the camera's sight (as opposed to the cited testimony regarding what is shown on the video). (LR Stmt.¶35.) Barry specifically testified that when Powers came up to him he was "pushed and hit and told to get out of here" and then he crouched down by the curb with his jacket over his head while he was hit in the arm, shoulder and side by multiple persons. (*Id.*) Thus, although Barry cannot personally identify which of the other officers did what, he has consistently identified Officer Powers as participating.

### 5. Defendants' Confusion of the Vestibule and the Foyer Does Not Create an Inconsistency In Barry's Testimony

Defendants' argument that the video refutes Barry's testimony describing that Planey held him against the wall, yelled at him and that both Powers and Planey hit him is also misplaced. *See* Def. Mem., Dkt. 250 at 25; Mem. Dckt. No. 252 at 6-7. Defendants argue that these events could not have occurred because entire time that they were in the vestibule is one second (3:40:40-4:40:41). Once again, Defendants argument is based on manipulation of the evidence. Barry's testimony to which Defendants cite actually discusses events that occurred in the "foyer." The foyer is directly next to the vestibule and these events were caught on tape as well as confirmed by non-party witnesses. (LR Smt. ¶¶30-32.)

Indeed, Defendants' own statement of facts demonstrates that Defendants are misrepresenting the evidence with this argument. The evidence cited is testimony describing events starting eight seconds early in the foyer (at 3:40:32). Def. Mem., Dkt. 250 at 22 citing Def. Stmt. Facts ¶43. Thus, the fact that they were only in the vestibule for one second does not contradict the testimony or the video establishing the excessive force in the foyer. The video at 3:40:32 to 3:40:38 shows Sgt. Planey and Officer Powers holding Barry up against the wall. At 3:40:38, they then push Barry into the vestibule and then outside. Once again, far from contradicting Barry's testimony, the video actually corroborates the events as described by Plaintiffs.

6. **The Plaintiffs Did Not "Recant" Their Testimony Regarding Officer Barnes' Final Acts of Violence**

As described above, as the last Responding Officers were leaving the scene Officer Barnes pushed and shoved Aaron Gilfand. (LR Stmt. ¶67.) This violence was described by Plaintiffs, as well as independent witness Kevin O'Janovac. (*Id.*) Similar to the above arguments, Defendants' claims that Plaintiffs "recanted" their testimony as to this attack is bellied by the record. Def. Mem., Dkt. 250 at 18-19, 37-38. Defendants' argument cites to Paragraph 34 of Defendants' statement of facts, which states: "Indeed, Barry Gilfand testified at the criminal trial that he did not recall any words or actions exchanged between Plaintiffs and any people who had been in JTAG after 3:49:08 a.m., when they were on the sidewalk south of the vestibule outside JTAG after the altercation in the vestibule. *Ex. 38, 268:2-269:16."*

The cited testimony does not support Defendants' argument whatsoever. Barry was asked to describe where the Plaintiffs were located at a particular point in time, 3:49:08 a.m. (Def. Ex. 38 at 268.) This was two minutes <u>before</u> Barnes even approached Plaintiffs. (LR Stmt. ¶63

22

(Barnes approached the group at 3:51.)) In the testimony cited by Defendants, the video is played

for an unknown period of time to an unknown point where it is stopped and Barry is asked,

"Right before you entered were there any words exchanged between yourselves and the people

that had been in the bar?" (Def. Ex. 38 at 269.) Barry answered, "Not that I recall." (*Id.*) This is

not a recantation of the testimony describing the pushing incident, it is a specific question and

answer about a specific moment in time that followed the pushing incident.

Defendants likewise argue that Aaron's account of this same event should not be credited

because "suspiciously" it is not contained State's Attorney's summary of his interview or in his

dramshop deposition. *See* Def. Mem., Dkt. 250 at 37. As with many of the above arguments,

here Defendants continue to point to portions of testimony that don't contain certain details to

argue that the omission at that point in that testimony contradicts the testimony elsewhere. All of

these arguments should be rejected. At best they are points of impeachment. Similarly,

Defendants' arguments that the video establishes events did not happen – such as Barry's

"admission" that Barnes' pushing Aaron to the south of the Tap is not on the video – misses the

mark. *Id.* at 38 ("Barry Gilfand also conceded that nowhere <u>in the video</u> does Barnes offensively

touch Aaron or himself"). The fact that certain events did not occur within the sights of the

Jefferson Tap security cameras does not mean that they did not happen. That Barnes pushed and

shoved Aaron is established by Plaintiffs' testimony as well as the testimony of a non-party

witness. (LR Stmt. ¶67.) Further, it is supported by the video that shows the officers moving in

the direction of the Plaintiffs to the south of the bar (and off camera). (*Id.* ¶¶63, 68-69.)

### 7. Neither the Video Nor the Medical Evidence Contradicts Barry Gilfand's Description of the Beating.

Defendants exaggerate Plaintiff's description of one the attacks in order to set up a straw man that they can knock down. In responding, Plaintiffs certainly do not mean to downplay the severity of the abuses at issue in this case, but the hitting and kicking to north of the Tap (off-camera) lasted a few seconds. (LR. Stmt. ¶¶37, 42.) Barry Gilfand has never described a "savage beating" of the sort that Defendants suggest – that which would have caused visible and immediate serious injuries.

### (a) Barry Did Not Approach Powers Following the Beating

Defendants argument that the fact that Barry stood within a few feet of Officer Powers proves that he was not "savagely beaten" fails. *See* Def. Mem., Dkt. 250 at 12-13, 26; Mem. Dkt. No. 252 at 7-8. Like so many of the above arguments, this one seems to be based on the hope that neither the Court nor Plaintiffs in responding would actually review the evidence cited.  The video cited is Camera 1 at 3:43:57-3:44:06. This video shows Barry tentatively approaching the vestibule – trying to get to his brother inside – while staying back at least five to six feet away from Powers.  At the same time, Officer Powers attempts to enter the vestibule but is pushed out by Sgt. Planey and then led away by Officer Padilla. It is only then – when Powers is escorted away – that Barry actually approaches the vestibule (at 3:44:14).

### (b) That Barry Was Able to Walk and Carry His Coat Does Not Prove That He Was Not Hit or Kicked

To be absolutely clear, Barry Gilfand has <u>never</u> suggested that he was unable to walk or move as a result of the beatings. Nor does Plaintiff claim that his ribs were broken. Barry testified that following the incident he did not even go to the hospital because he thought it was just "bumps and bruises." (LR Stmt. ¶80.) Barry testified, "I felt sore and bumped and bruised,

24

but I didn't really think I had any sort of real injury." *(Id.)* A few days later he went to the hospital because his back and breathing started hurting. *(Id.)* It was only because his soreness increased over time that he went to the hospital where the emergency room doctor told Barry that he had fractured ribs. Thus, through no fault of his own, Barry believed that he had fractured ribs. It was only through discovery in this case that the x-ray reports were obtained and showed that there were not in fact any fractures.

It is true, as Defendants argue, that the video shows Barry walking on the sidewalk holding his coat without visible injury. *See* Def. Mem., Dkt. 250 at 13, 26-27; Mem. Dkt. No. 252 at 21-22. The significance that Defendants impart to this fact, however, is ridiculous. Defendants argue that "this is significant because …Barry Gilfand has testified that he received four broken ribs." *See* Def. Mem., Dkt. 250 at 13. In the cited testimony, Barry describes what is undisputed in this case: that the doctor told him that he had fractured ribs. *See* Defs. Stmt. Facts ¶72 citing Ex. 18 at 82; *see also* Defs. Ex. 43 at 6 and 8 (medical records diagnosing fractures). What Barry reported at the emergency room was that he had increasing soreness, pain, and some trouble taking deep breaths. Barry never claimed that he was beaten so badly that he had trouble moving or walking (much less the "splinting pain" and "deformities" that Defendants and their experts discuss (*see e.g.,* Def. Mem., Dkt. 250 at 13, 37)). Since the dramshop deposition, Barry has testified and amended his interrogatory answers to state that he did not in fact have fractures as his treating physician initially told him. Fractures or not, none of this changes his own description of how he felt in the days that followed, which has always been consistent.

Defendants spend no less than thirteen pages discussing Barry's injuries and their medical experts. Nowhere in all those pages is there any actual inconsistency, and certainly not one that would allow this Court to grant summary judgment.

25

**(c)** **Established Case Law Requires This Court to Reject Defendants' Arguments Regarding Barry's Injuries**

At summary judgment, this Court cannot make findings of credibility based on Defendants' characterizations of Barry's injuries. In *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009), the Seventh Circuit emphasized the need to draw all reasonable inferences in light most favorable to plaintiffs. The Court also admonished the district court for placing improper weight on plaintiffs' failure to establish that injuries resulted from the use of force:

> It also may have placed some weight on the plaintiffs' failure to show that they had suffered any sustained injuries as a result of the arrests. If so, that too would have been a mistake. … although evidence of injury can throw some light on the question whether the officers used excessive force, there is no requirement that plaintiffs show any particular degree of injury. *Chelios*, 520 F.3d at 690. In any event, all of the plaintiffs testified that they were injured, with some plaintiffs (Antonio, for example) testifying that they were seriously injured.

*Id.* at 539-40. Defendants ask this Court to deny Barry's excessive force claim because he did not have severe medical injuries. Doing so would contradict established Seventh Circuit case law.

Furthermore, none of the cases cited by Defendants allow the Court to make the findings of credibility that Defendants seek. Defendants' reliance on *Lust v. Razzino*, No. 08-C-7346, 2010 WL 845942 (N.D. Ill. March 3, 2010) is misplaced. In that *pro se* case the plaintiff alleged that he was running away from some men when police officers struck him with their vehicle, tripped him, beat him and used a needle to inject him with a virus. *Id.* at *3. The court in *Lust* found that there was no evidence suggesting that the officers who Lust described as beating him were the named defendants. *Id.* at *6. Defendants were granted summary judgment on the excessive force claim because the plaintiff failed to provide any evidence of the defendants' personal involvement in the beating by unidentified officers. *Id.* at *6-7. In so holding, the court also noted that the injuries claimed were unsupported by the medical records. *Id.* at *7. Contrary

26

to Defendants' arguments here, however, that was not the basis for the court's ruling. The granting of summary judgment firmly rested on the fact that there was no evidence establishing that the defendants – who were the officers who transported the plaintiffs – were the same officers who Lust described as the beaters. *Id.*

The one other case to which Defendants cite does not further their argument. In that unpublished Seventh Circuit case summary judgment was upheld based upon uncontroverted and undisputed evidence, and not upon inconsistencies and points of impeachment as Defendants argue here. *Johnson v. Moeller*, 269 F.App'x. 593 (7th Cir. 2008). In that case, a security camera showed that the plaintiff lunged at another prisoner and then punched an officer. *Id.* at 594. The prisoner claimed that an officer struck him six to eight times in the head, but the video showed that the officer only struck him once in the back while attempting to restrain him. *Id.* at 596. The Seventh Circuit found that "no reasonable juror could believe Johnson's version of events" because the security video proved it to be false. *Id.* In so holding, the Court primarily relied upon the video, but also noted that the medical records submitted by the plaintiff did not further his claims because it was just as likely the bumps and cuts described could have been caused by the plaintiff's fight with another prisoner. *Id.*

Unlike the claim in *Johnson,* Barry Gilfand's excessive force claim is supported by both the video and the medical records. Two of the three incidents of violence described by Barry were caught on video showing Sgt. Planey slamming Barry into the wall by this throat. Barry's third incident of excessive force was not captured on video, but is supported by the medical evidence – that he had soreness in his abdominal area – as well as his own testimony. Unlike the *Johnson* case, neither the video nor the medical records contradict Barry's description of the excessive force against him.

27

**(8)    Defendants' Arguments At Best Constitute Points of Impeachment and Cannot Be Grounds for Summary Judgment**

*Scott v. Harris* did not change summary judgment standards. 550 U.S. 372, 380, 127

S.Ct. 1769 (2007). *See also National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d

508, 512 (7th Cir. 2008) ("A court's role is not to evaluate the weight of the evidence, judge the

credibility of witnesses, or to determine the truth of the matter, but instead to determine whether

there is a genuine issue of triable fact."). In *Scott,* and similar cases, where undisputable evidence

"blatantly contradicts" the allegations, the court must consider that evidence in determining

whether there is an issue of fact. 550 U.S. at 380. Here, in contrast, Defendants ask this Court to

make findings of credibility based on a highly controverted record. As demonstrated above, none

of Defendants' arguments conclusively establish that Defendant Officers did not use unjustified

violence against Plaintiffs. At best these arguments constitute impeachment for cross-

examination; however, given how much of the testimony cited by Defendants is not actually

inconsistent – but has been blatantly misconstrued – even that is questionable.

While Plaintiffs deny that their various testimony over the years has been inconsistent, as

this Court has often noted, even in cases of inconsistencies it is for the jury to decide whether the

plaintiffs' account is credible. *See e.g., Stamps v. Hernandez*, No. 08 C 2196, 2010 WL 3713686,

at *5 (N.D. Ill. Sept. 14, 2010) ("The Court finds that determining the reasonableness of the

execution of the warrant involves too many factual ambiguities for the Court to resolve on

summary judgment."); *Hinks v. Graco, Inc.*, No. 91 C 5571, 1993 WL 350193, 3 (N.D. Ill. Sept.

3, 1993) ("While he has created large issues of credibility with his inconsistent positions, he

must be allowed to explain these inconsistencies at trial."). Likewise, the Court may not make

findings of credibility even in a where party's account appears implausible so long as it is

supported by some evidence that the jury could credit. *Washington v. Haupert* 481 F.3d 543, 550 (7th Cir. 2007) ("However implausible the Washingtons' account might seem, it is not our place to decide who is telling the truth."). *See also Schneider v. Love*, 09 C 3105, 2011 WL 635582, at *5 (N.D. Ill. Feb. 10, 2011) (in denying summary judgment, the "jury may choose to believe the officers' testimony over plaintiff's, particularly in light of possible impeachment of plaintiff. Even if it is more likely than not that a jury would believe the officers' testimony, it would not be unreasonable for a jury to believe plaintiff."); *E.E.O.C. v. International Profit Associates, Inc.*, 647 F. Supp. 2d 951, 981 (N.D. Ill. 2009) (in denying summary judgment, "a jury may indeed have difficulty pinning down exactly what was said, by whom, and on how many occasions, and that variations and inconsistencies in her testimony undermine her credibility. It is not the domain of the court, however, to decide whether [the plaintiff's] allegations are believable.").

Defendants look to the Eighth Circuit in an effort to find some support for their request that this Court make findings of credibility. *Reed v. City of St. Charles, Missouri*, 561 F.3d 788 (8th Cir. 2009). Even that case, however, fails to support Defendants' argument in light of the record in this case. In *Reed,* police responded to a domestic call to find Reed beating the victim. *Id.* at 789. The police testified that Reed ran and hid from them under a bush and refused to come out, resisted arrest and refused to show his hands – where he held a screwdriver – all causing them to use force in order to detain him. *Id.* at 789-90. Reed claimed that he calmly waited for the police to find him and cooperated once they did. In his excessive force claim, Reed alleged that he was struck in the head with a metal flashlight. *Id.* at 790-91. However, the physical abuse that Reed alleged was contradicted by the medical evidence. *Id.* at 791. Moreover, Reed had pleaded guilty to five felony charges including resisting arrest. *Id.* Because the Reed's account

29

was discredited by the guilty plea and the officers' account was supported by the emergency room records, the Eighth Circuit upheld the granting of summary judgment. *Id.*

The holding of *Scott v. Harris* has been strictly limited to situations in which evidence – such as a video – <u>conclusively</u> establishes that the plaintiff's version of the events cannot be true. No court has held that the kind of cross-examination impeachment that Defendants argue here – none of which is even close to conclusive – could result in findings of credibility allowing summary judgment. *See Coble v. City of White House,* 634 F.3d 865 (6th Cir. 2011) (overturning summary judgment for defense where audio recording of portions of incident contradicted the plaintiff's description of painful screaming during the excessive force incident); *York v. City of Las Cruces*, 523 F.3d 1205, 1210-1211 (10th Cir. 2008) (denying summary judgment where only portions of the events at issue were captured on video tape and therefore did not "blatantly contradict" the plaintiff's version). The above discussion of Defendants' arguments make the obvious point here: factual disputes regarding the events in this case make summary judgment unavailable. *Abdullahi v. City of Madison*, 423 F.3d 763, 773(7th Cir. 2005) (because the excessive force "inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.") (internal quotation omitted).

## IV.   DEFENDANTS RESPONDING OFFICERS' MOTION FOR SUMMARY JUDGMENT ON THE FAILURE TO INTEVENE CLAIM MUST BE DENIED[5]

The evidence establishes that two of the Responding Officers were on the scene during the final act of violence by Officer Barnes. The other Responding Officers left prior to that

---

[5] Plaintiff agrees to dismiss Officers Enrique and Howe from this action as discovery has not revealed sufficient evidence to establish their knowledge or opportunity to intervene in the excessive force.

instance of excessive force, but they all had the requisite knowledge and opportunity to prevent the harm. These officers should not be granted summary judgment any more than should officers who turn their backs so as to not see another officer using excessive force. Plaintiffs do not seek to hold the Responding Officers liable for the excessive force that occurred prior to their arrival (the sole issue argued in Defendants' motion for summary judgment). Instead, these officers are liable for the final instance of excessive force which occurred while Responding Officers Mayoski and Pina were present and moments after the other Responding Officers had fled the scene of the "battery in progress" to which they had a duty to respond.

"Omissions as well as actions may violate civil rights." *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994). Where an officer has an opportunity to intervene in order to prevent a constitutional violation, but fails to do so, he may be held liable for that violation. *Id.* In *Yang,* the Seventh Circuit found that the officer who stood by while another used excessive force "could have acted. At a minimum, [he] could have called for backup, called for help … In fact, Officer Hardin should have arrested Officer Brown." *Id.*

In this case, the Responding Officers were not present for many of the attacks, but they all had the opportunity to intervene to prevent the final acts of excessive force and they failed to do so. As in the *Yang* case*,* these officers "could have acted" – they should have helped Plaintiffs and stopped their fellow officers from attacking civilians. Instead, they protected their friends, the Off-Duty Officers, by turning their cars around and closing out the dispatch call without reporting the Defendant Officers or intervening to stop Officers Barnes, Matthews and Planey from committing further abuses.

31

### A.    Officer Mayoski and Pina Were Present and Failed to Intervene in the Excessive Force

Responding Officers Mayoski and Pina were called to the scene of a hold-up alarm and a "battery in progress." (ROD Facts ¶12.) When they arrived they found Officer Barnes covered in Aaron's blood, Barry screaming for help and the Jefferson Tap owner and employee asking them for help. (LR Stmt. ¶¶53, 60, 62, 65-66.) They knew that Officer Barnes and his teammates were involved in the "battery in progress." (*Id.* ¶61.) They talked to Officer Barnes during the events both on the phone and in person. (*Id.* ¶¶61, 71.) Officers Mayoski and Pina ignored their duties as police officers just like they ignored Barry's screaming and Aaron's blood, and ignored Jody Agee by rolling up their window when she tried to talk to them. (*Id.* ¶¶ 65-66, 74-75, 79.) When Officer Barnes walked away from them to continue attacking Plaintiffs, he did so with the knowledge that these on-duty officers would not intervene. He was right; they sat by and allowed it to happen. (*Id.* ¶¶63-68.)

When Barnes walked away from Officers Mayoski and Pina he walked over to Plaintiffs where Barry was screaming. (*Id.* ¶¶63-64.) He told them, "you better shut him the fuck up." He then grabbed Aaron and pushed and shoved him. (*Id.* ¶67.) Officers Mayoski and Pina were still present on the scene of the Tap when this happened. (*Id.* ¶¶64-68.) In fact, the video shows their car turning and slowly driving past the location where the final incident of excessive force was occurring. (*Id.* ¶68.)

Although Officers Mayoski and Pina deny all knowledge of the events and the off-duty officers' involvement, Officer Barnes' own testimony establishes that they did in fact know that the other officers were involved in the battery in progress. Further, the video evidence and testimony from non-party witnesses establishes that these two officers were present for the final

acts of excessive force. In these circumstances, the law is clear that regardless of the officers'

denials, there is sufficient evidence upon which the jury could hold them liable. *Miller v. Smith,*

220 F.3d 491, 495 (7th Cir. 2000). *See also Smith v. Hunt*, 08 C 6982, 2010 WL 3842374, at *8

(N.D. Ill. Sept. 27, 2010).

> **B.** **The Other Responding Officers Had the Knowledge and Opportunity Requiring Them to Intervene to Prevent the Harm To Plaintiffs**

Responding Officers' motion is premised on the assumption that presence during the

excessive force is an element of the claim. That is not so. "We believe it is clear that one who is

given the badge of authority of a police officer may not ignore the duty imposed by his office

and fail to stop other officers who summarily punish a third person in his presence <u>or otherwise

within his knowledge</u>." *Byrd v. Brishke*, 466 F.2d 6, 11(1972). Admittedly this case presents a

unique situation. In most failure to intervene cases, the issue revolves around officers who stand

by watching while others use excessive force. In those cases the "opportunity to intervene" is

discussed in terms of the officer's presence at the time of the constitutional violation. That was

the situation in the case of *Boyle v. Torres*, 756 F. Supp. 2d 983 (N.D. Ill. 2010), on which

Defendants rely. Alghouth highly probative of opportunity, presence is not a requirement. The

well established elements are: (1) the officer had knowledge of the constitutional violation

(excessive force); and (2) the officer had the opportunity to intervene to prevent the harm from

occurring. *Lanigan v. Vil. of E. Hazel Crest,* 110 F.3d 467, 478 (7th Cir. 1997); *see also

Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).

In *Morfin v. City of E. Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003), the Seventh Circuit

made clear that an officer could be held liable for failure to intervene without being physically

present for the violation if the officer knowingly turned a blind eye to the violation. In that case,

the police chief had a brief phone conversation with the defendant officer prior to his arrest of the plaintiff. *Id.* at 1001-1002. Although there was no evidence to suggest that the police chief in that case was aware that the officer was about to make a false arrest, the Seventh Circuit found that if there had been evidence in the record to suggest "that Chief Alcala had knowledge of facts that would cause him to believe that Officer Kovats was about to make an unconstitutional arrest but failed to use his authority to stop the violation, his failure would result in liability under § 1983." *Id.* at 1001.

Although Responding Officers Lupo, Collins, Kingsley, Carolyn and Morabit may not have been on the scene during specific instances of violence, evidence in the record suggests that these officers had knowledge of facts that would cause them to believe that the off-duty officers were using excessive force. *Id.*

- Barry begged Officers Lupo and Collins for help including that he told them, "we're being attacked" and "my brother is in there, please help me." (LR Stmt. ¶¶54-59.)

- Aaron's blood was on the vestibule and on Officer Barnes. (*Id.* ¶79.)

- When Officers Carlyon and Morabito responded to the scene, Barry, Adam, Aaron, Scott and witness Emily Martin were all present outside of the Tap and within a few feet of these officers. (*Id.* ¶77.)

- When Sgt. Kingsley responded to the scene Plaintiffs were to the south of the Tap within a few feet of his car. (*Id.* ¶78.)

- Barry was screaming the whole time that the Responding Officers were present, including screaming that his brother was bleeding in the vestibule. (*Id.* ¶¶52, 60, 64.)

Further, these Responding Officers had the opportunity to intervene. These officers were responding to a "hold-up" and a "battery in progress." (ROD Facts ¶12.) They arrived at the scene where Barry Gilfand was screaming desperately for help. (LR Stmt. ¶¶60, 64, 66.) Barry

specifically told Officers Collins and Lupo that his brother was inside and that they were being attacked. (*Id.* ¶54.) As police officers, these Defendants knew they had a duty to get out of their squad cars and investigate the battery in progress. (*Id.* ¶¶74, 75.) Indeed, as in the *Yang* case, they should have arrested Defendant Officers. But regardless of any arrest, they had the opportunity to stop to the unfinished violence of the off-duty officers. This evidence is sufficient to require the failure to intervene claim to be heard by the jury. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all of the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of E. Hazel Crest,* 110 F.3d 467 at 478 (7th Cir. 1997).

Responding Officers cite the Seventh Circuit's decision in *Montano v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008), throughout their brief. In that case the Court found that "none of the evidence cited by the plaintiffs … mention that [defendant] was even involved in Montaño's arrest." *Id.* at 569. In this case, in contrast, the Responding Officers admit that they knew there was "battery in progress" to which they were supposed to respond. (ROD Facts ¶12; LR Stmt. ¶75). There is a host of evidence from which the jury could reasonably draw an inference that the Responding Officers knew that the off-duty officers were involved in the battery and that they purposefully left without responding to the 911 calls as a result of that knowledge. That evidence includes but is not limited to the cell phone communications between the off-duty officers and the Responding Officers (LR Stmt. ¶¶71-73); that Officer Barnes was walking around covered in Aaron's blood (*Id.* ¶62); that Officers Lupo and Collins denied seeing anyone or anything unusual even though the video shows them slamming Collins' car door on Barry as he begged them for help (*Id.* ¶¶54-59); that Officers Mayoski and Pina denied any knowledge that the off-

35

duty officers were involved when in fact Barnes himself told them of their involvement (ROD Facts ¶44; LR Stmt. ¶61); and, that Morabito, Carolyn and Kingsley all deny seeing anything unusual (ROD Facts ¶¶48-49, 53-55) despite the fact that Plaintiffs, bar staff and the off-duty officers were all wandering around the street in the middle of the night with Barry screaming and Aaron's nose broken and bleeding. Indeed, the simple fact that every single one of these officers turned his car around and left the scene without doing *anything* to respond to the multiple dispatches suggests that they knew exactly what was going on. Why else would officers assigned to respond to a "hold-up" at a downtown bar, a fight involving 25 people and "battery in progress" fail to talk to the bar staff or assist the bleeding and injured victims?

By quickly leaving the scene once they learned that their fellow officers were involved in the battery, the Responding Officers allowed the off-duty officers to continue their excessive force. These officers had "a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail[ed] to do so" and therefore can be held liable under § 1983. *See Fillmore v. Page,* 358 F.3d 496, 505-06 (7th Cir. 2004); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994). In these cases, the "'official satisfies the personal responsibility requirement of § 1983 if she acts or *fails* to act with a deliberate or reckless disregard of the plaintiff's constitutional rights.'" *Fillmore,* 358 F.3d at 506 (quoting *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir. 1982) (emphasis in *Fillmore* ).

## CONCLUSION

For all of the foregoing reasons, all of the Defendant Officers and Defendant Responding Officers' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,


_____/s/ Amanda Antholt_____
One of the Attorneys for Plaintiffs


Amanda Antholt
Christopher Smith
Robert W. Johnson
James Baranyk
Smith, Johnson & Antholt LLC
112 S. Sangamon Street, 3rd Floor
Chicago, IL 60607
312.432.0400


## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that this Response to Defendants' Motions for Summary Judgment was served on counsel for all parties by electronic means on May 12, 2011.


_____/s/ Amanda Antholt_____