# EXHIBIT 59

COPY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BARRY GILFAND, et al.,         )
                               )
            Plaintiff,         )
                               )
    vs.                        )   No. 07 C 2566
                               )
SERGEANT JEFFERY PLANEY, et al.,)
                               )
            Defendant.         )

    The Deposition of JEFFERY PLANEY, taken before JEANINE WATKINS, C.S.R. and Notary Public within and for the State of Illinois, pursuant to the provisions of the Federal Rules of Civil Procedure of the United States District Court, pertaining to the taking of depositions, taken at 71 South Wacker Drive, Chicago, Illinois, commencing at the hour of approximately 10:00 o'clock a.m. on July 7, 2009.

Patti Blair Court Reporters, p.c.
(312) 782-8376

```
 1              (The witness was duly sworn.)
 2                    JEFFERY PLANEY
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5                    EXAMINATION
 6                    MR. SMITH:
 7       Q.   Can you please state your name for the
 8   record?
 9       A.   Jeffery Planey.  P-l-a-n-e-y.
10       Q.   Thank you.  Have you given a deposition
11   before?
12       A.   Yes, I have.
13       Q.   Just to remind you.  Just because there is
14   a court reporter, if we could try not to talk over
15   each other.  And also, you should be aware that not
16   all my questions make sense.  So, rather than answer
17   questions you don't understand, feel free to
18   indicate you don't understand them.  Okay?
19       A.   Yes.
20       Q.   Did you review any documents in preparation
21   for your deposition today?
22       A.   Yes, I did.
23       Q.   What did you review?
24       A.   My courtroom testimony.
```

1  anybody.  And Greg goes, he said to me, I didn't hit
2  anybody.  So, and frankly, at the end of it from
3  where Greg was standing in the vestibule, after I --
4  the last time I saw him, he wasn't the person that
5  was directly adjacent to Aaron Gilfand.
6      Q.  Who was the person that was directly
7  adjacent to Aaron Gilfand?
8      A.  As I stated before, when I finally got
9  my -- collected my accoutrements and was able to
10 see, Greg was to my left and he was closer to Adam,
11 and Kariakis was closer to Aaron.
12     Q.  Were you ever told by anyone that Matias
13 Padilla was the one who hit Aaron in the nose?
14     A.  I learned that during the course of talking
15 to my attorneys.
16     Q.  Did Greg ever tell you that Matias Padilla
17 was the one that hit Aaron?
18     A.  No.
19     Q.  Did Matias Padilla ever tell you that he
20 hit Aaron?
21     A.  He told me that -- he didn't mention Aaron
22 specifically, but after the fact, we talked about it
23 when we were in the presence of our attorneys.
24     Q.  What did he tell you?

```
 1      A.   I do believe the attorney-client privilege,
 2   we were in front of the attorneys at the time.
 3      Q.   What did Matias Padilla tell you?
 4           MR. GEIGER:  I'm going to object.  It's
 5   been asked and answered, and it's a privileged
 6   conversation.
 7           MR. SMITH:   Is he represented by you also?
 8           MR. GEIGER:  Yes.  He's given a deposition
 9   as well.
10           MR. SMITH:   But I don't know --
11           MR. GEIGER:  Yes, he is.
12   BY MR. SMITH:
13      Q.   Did Matias Padilla ever tell you outside of
14   the presence of your attorneys, ever tell you that
15   he'd hit Aaron or hit anybody?
16      A.   Just after, at the -- when we were going to
17   trial, he said if we needed to, he would -- if he
18   needed to testify, he will testify to what he was
19   deposed in.
20      Q.   Including the hitting of somebody in the
21   vestibule?
22      A.   Hitting of somebody.  I don't know if it
23   was specifically Aaron.
24      Q.   Did Barnes ever tell you that he was
```

```
 1      Q.   Isn't it true that the first movement
 2   toward Barry that you have is with your left hand
 3   toward the direction of his right hand?
 4      A.   Right there, yes.
 5      Q.   You can continue forward.  Stop.  Can you
 6   describe what you did in terms of before Barry hits
 7   the wall at 3:41:23?
 8      A.   I have a hold of his shirt with my left
 9   hand, it looked like.
10      Q.   What kind of force did you use to put Barry
11   up against the wall?
12      A.   I pushed him.  I don't know.
13      Q.   Did he resist you in any way at that point
14   in time?
15      A.   I don't -- I don't recall what his actions
16   were besides moving and changing directions to where
17   that's where we wound up.
18      Q.   What was your purpose in pushing Barry
19   toward that wall?
20      A.   It wasn't my purpose to push him toward the
21   wall.  It was my purpose to push him farther down
22   the sidewalk.  When he changed directions, that's
23   what took us into the wall.
24      Q.   What was your purpose in pushing him
```

```
1    further down the sidewalk?
2         A.   Get him to leave.
3         Q.   So, you felt you had a basis to not only
4    get him to the outside of the establishment where
5    the action was going on but to actually require him
6    to leave and go home?
7              MR. GEIGER:  I'm going to object to the
8    form of the question, action going on.  If you know
9    what he meant, go ahead.
10             THE WITNESS:  I don't know what he meant.
11   BY MR. SMITH:
12        Q.   Well, you would agree that there might
13   have been things still going on inside the Jefferson
14   Tap while you were still on the sidewalk; is that
15   correct.
16        A.   I don't know what was happening inside the
17   bar.
18        Q.   You would agree that it was possible things
19   were happening inside the bar?
20        A.   There is a possibility, yes.
21        Q.   You would agree that the only two people at
22   3:41:20 out on the sidewalk were you and Barry,
23   correct?
24        A.   Correct.
```

1    Q.   If we could run it forward.  We had a skip.
2 Stop.  Can you go back just a little bit?  I'm
3 pretty sure it was just a skip in the video.  Stop.
4 All right.  You see at 3:41:30 you can still see the
5 sidewalk, and now Powers is out of the picture and
6 you guys are still out of the picture, you being
7 Barry and yourself, correct?
8    A.   Yes.
9    Q.   I think you'll see a skip right around
10 3:41:37 if you're watching.  If you could play it
11 forward.  Stop.  I think the skip was about 3:41:34.
12        MR. GEIGER:   57.
13 BY MR. SMITH:
14    Q.   We sort of stop back in right around
15 3:41:57?
16    A.   Yes.
17    Q.   You're still out of the picture, although I
18 think if you're looking at the corner you might be
19 coming back in the picture at 3:41:58 if we could
20 run it forward.  You see yourself at 3:41:59.995 in
21 the screen again?
22    A.   Yes.
23    Q.   Camera 1?  Do you see yourself with your
24 right hand going with your elbow bent toward your

```
 1    jacket pocket area?
 2         A.   Yes.
 3         Q.   What were you putting in your pocket, if
 4    anything?
 5         A.   I was putting nothing in my pocket.
 6         Q.   If you could continue forward.  Stop.  Did
 7    you have anything in your hand, your left hand --
 8    I'm sorry -- your right hand as you were walking
 9    toward the vestibule?
10         A.   No.
11         Q.   At any point in time?
12         A.   No.
13         Q.   You would agree that you would never steal
14    somebody's cell phone?
15         A.   Yes.
16         Q.   I mean --
17              MR. MARSH:  Yes, you would agree, right?
18              THE WITNESS:  I would agree that I would
19    not steal a cell phone, yes.
20    BY MR. SMITH:
21         Q.   As an officer, would there ever be any
22    circumstances that you would want to take somebody's
23    cell phone if you felt it might instigate a
24    disturbance?
```

```
 1       A.   I don't understand.
 2       Q.   Is there any possibility as you sit here
 3  today that you forgot that you took Barry Gilfand's
 4  telephone?
 5       A.   Absolutely not.
 6       Q.   I guess it wouldn't be a good enough
 7  question to say if you did take Barry Gilfand's
 8  telephone would you agree you weren't stealing it?
 9       MR. GEIGER:  Don't answer that.
10       MR. SMITH:  You can object.
11  BY MR. SMITH:
12       Q.   All right.  3:42:03.  You see yourself at
13  the vestibule area?
14       A.   Yes.
15       Q.   Is the door to the vestibule still closed?
16       A.   Yes.
17       Q.   Do you recall if you saw anyone in the
18  vestibule at that point in time?
19       A.   No.
20       Q.   And you would agree that your back is now
21  to the area where Barry and Paul Powers would have
22  been?
23       A.   My back is to -- facing directly where Paul
24  Powers was, and Barry was across the street on the
```

```
 1   correct?
 2       A.   Yes.  That's what it appears to be.
 3       Q.   And you're sort of slowly following after
 4   them, correct?
 5       A.   Yes.  I'm walking on the sidewalk.  I don't
 6   know if I was following them directly.
 7       Q.   Do you know if they were going in the
 8   direction of Barry Gilfand at that point in time?
 9       A.   Barry Gilfand was toward the north of
10   there, yes.
11       Q.   What was Barry doing at that point in time?
12       A.   I don't know exactly.
13       Q.   Did any of them make contact with Barry at
14   that point in time?
15       A.   I never saw anybody make any contact with
16   Barry.
17       Q.   Okay.  If we could play forward from
18   3:42:44.  Stop.  Did you see yourself turn around
19   and go back toward the vestibule?
20       A.   Yes.
21       Q.   At around 3:42:46, I think?
22       A.   Yes.
23       Q.   Did anything catch your attention at that
24   point in time?
```

```
STATE OF ILLINOIS  )
                   ) SS:
COUNTY OF COOK     )
```

I, Jeanine Watkins, C.S.R. and Notary Public, do hereby certify that I reported in shorthand the testimony held at the deposition of JEFFERY PLANEY on July 7, 2009, and that this transcript is a true and accurate transcription of my shorthand notes so taken, to the best of my ability, and contains all of the proceedings given at said deposition; and, further, that I am not counsel for nor in any way interested in the outcome thereof.

I further certify that this certificate applies to the original signed IN BLUE and certified transcripts only. I assume no responsibility for the accuracy of any reproduced copies not made under my control or direction.

IN TESTIMONY WHEREOF, I have hereunto set my hand this August 20, 2009.

_____
Jeanine Watkins, C.S.R.
License No. 084-001629

Patti Blair Court Reporters, p.c.
(312) 782-8376