IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BARRY GILFAND, AARON GILFAND,
ADAM MASTRUCCI, and SCOTT
LOWRANCE,

                Plaintiffs,

       v.

SGT. JEFFREY PLANEY, OFFICER
GREGORY BARNES, OFFICER
DEMETRIOS KEREAKES, OFFICER
VINCENT MATTHEWS, OFFICER
MATIAS PADILLA, OFFICER PAUL
POWERS, OFFICER ERICA WOOSLEY,
SGT. DALE KINGSLEY, OFFICER
KENNETH CARLYON, OFFICER
FREDERICK COLLINS, OFFICER
NICOLE MAYOSKI, OFFICER ANA
PINA, OFFICER JESUS ENRIQUEZ,
OFFICER MICHAEL HOWE, OFFICER
DONALD LUPO, OFFICER GREGORY
MORABITO, and THE CITY OF
CHICAGO,

                Defendants.

Case No. 07 C 2566

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions for Summary Judgment on all counts of Plaintiffs Barry Gilfand, Aaron Gilfand, Adam Mastrucci, and Scott Lowrance's Second Amended Complaint from (1) Defendants Jeffrey Planey, Demetrios Kereakes, Vincent Matthews, Matias Padilla, and Erika Woosley; (2) Defendants Paul Powers and Gregory

Barnes; (3) Defendants Dale Kingsley, Kenneth Carlyon, Frederick Collins, Nicole Mayoski, Ana Pina, Donald Lupo, Gregory Morabito, Jesus Enriquez, and Michael Howe; and (4) Defendant the City of Chicago.  For the reasons set forth below, the Court denies all four Motions.

## I.  BACKGROUND

Last call did not go smoothly at the Jefferson Tap in the early morning of December 15, 2006.  As closing time approached at the Chicago bar, Plaintiffs Barry Gilfand, Aaron Gilfand, Scott Lowrance, and Adam Mastrucci (hereinafter, the "Plaintiffs" or referred to by their first names) played pool.  Off-duty Chicago Police Officers Jeffrey Planey, Gregory Barnes, Vincent Matthews, Paul Powers, Matias Padilla, Demetrios Kereakes, and Erika Woosley (hereinafter, the "Off-duty Officers" or referred to by their last names) were at the bar.  Shortly after 3:30 a.m., a confrontation began between these two groups.  As expected, the parties offer vastly conflicting versions of how this confrontation began.

The pool table on which Plaintiffs played was located near the front of the bar.  Plaintiffs claim that they minded their own business and had not interacted with the Off-duty Officers.  They claim that as the Off-duty Officers passed the pool table, the Off-duty Officers became aggressive toward them.  The Off-duty

Officers, on the other hand, claim that Plaintiffs instigated the confrontation by mocking and hurling insults at Powers, who was visibly upset and crying. Powers grieved because his father had recently died, and the approaching Christmas would be his first without his father. The Off-duty Officers claim that they initially approached Plaintiffs and asked them to stop calling Powers names. They also claim that they did not identify themselves as Chicago police officers. Further, they contend that they tried to leave the bar because of the insults, but when Plaintiffs did not stop their verbal assault of Powers, the altercation began.

Regardless of who instigated the confrontation — as this is not dispositive of Plaintiffs' excessive force and failure to intervene claims, as such insults would not give the Off-duty Officers the right to attack Plaintiffs — much of the events were captured by the Jefferson Tap's security video system (albeit without audio). The video has a running time clock. Camera 9 focused on the pool table where the fight began. The video shows Plaintiffs interacting with each other and taking turns shooting pool. Shortly after 3:38 a.m., Powers passed the table, and appeared to say something to Plaintiffs. Padilla pushed Powers past the table, presumably toward the front door. A few seconds

later, Matthews appeared and grabbed the remaining balls on the table and put them into the pockets, which ended Plaintiffs' game. Padilla and Kereakes approached the table and Barry, pool cue in is right hand, shrugged his shoulders and made a gesture that appeared to ask something akin to "what's going on?" Padilla reached across the table and grabbed the cue from Barry's hand. Powers approached Barry, bumped him, and appeared ready to fight. The two were separated, and Powers walked away from the table.

Commotion ensued and tensions rose. Matthews, standing at one end of the pool table, waved his hands seemingly to point people toward the front door in an effort to diffuse the situation. Immediately thereafter, however, Powers reappeared and rushed toward one of the Plaintiffs in what appeared to be an aggressive gesture to fight. Kereakes caught Powers and pushed him away.

Thereafter, as can happen late at night in a bar after alcohol has been consumed, what started as a mild dustup turned into a major fight. A commotion broke out in the upper right-hand portion of the video from Camera 9. Planey threw Aaron to the ground on one side of the pool table, and Powers immediately came into view and appeared to hit Aaron. Next, Planey appeared to wrap his left hand around Barry's throat and forcibly push him back. Planey and Padilla then grabbed Scott and threw him down on the pool table

with such force that the table moved backward several inches.  They wrestled Scott to the ground, and Padilla maintained what appeared to be a chokehold on Scott while he kept him pinned to the ground. Kereakes and Woosley approached Padilla and convinced him to release Scott, who remained on the ground and appeared hurt as several people attended to him.  Adam alleges that one of the Off-duty Officers pushed or hit him when he went to help Scott.  Scott, who is blind in one eye, alleges that he lost consciousness and that for a short time he thought he had lost sight in his other eye.

When Scott was lying on the ground, Planey approached Barry on the opposite side of the pool table and directed him outside. Barry contends that Planey told him to leave the bar.  This occurred around 3:40:20 a.m.  Camera 6 captured Planey push Barry by his neck toward the front vestibule.  Padilla followed and did not try to disengage Planey from Barry.  Powers then appeared and quickly moved to where Planey had pushed Barry up against the wall. Again, Padilla, who was in the vicinity of the vestibule, did not attempt to stop Powers.  In the video from Camera 6, only the back of Planey and Powers up to their necks is visible during the confrontation in the vestibule.  After a few seconds, Planey, Powers, and Barry exited the bar.  The video does not clearly show

- 5 -

if Powers and Planey pushed Barry, or if Barry walked out on his own accord.

Camera 1, which captured video outside of the bar and pointed toward the front door, recorded some evidence into what occurred. Close to 3:40:45 a.m., Barry, Powers, and Planey emerged outside, with Powers pushing Barry; Planey then separated Powers from Barry. Planey turned around in response to Barry, who motioned toward the bar's front door.  Again, Powers moved toward Barry, and Planey separated them.  Planey walked Powers toward the front of the bar, opened the door, pointed inside, and seemed to command Powers to enter the bar.  Powers went inside and Planey turned around and walked toward Barry, who threw his hands up.  Planey grabbed Barry and slammed him against the outside wall of the bar.  Barry alleges that he had tried to take his cell phone out of his pocket to make a call for help, but that Planey took the phone from him.

Powers did not stay inside the bar, and seeing that Planey had pushed Barry against the wall, Powers approached.  Planey and Barry disappeared from the video, and Powers followed them outside the camera's view.  After about ten seconds, Planey walked toward the bar's front door.  He entered the bar, turned around, pointed at someone, and appeared to say something.  Powers and Barry were still not in the camera's view.  Barry appeared briefly at the

bottom of the screen with his hands raised. A stream of people left the bar, and Planey continued to gesture and say something toward where Powers and Barry were located. Powers appeared on the video with his hands on his head, and then he, Barnes, Kereakes, and Matthews moved out of the video, presumably toward Barry. Padilla then walked toward them. Barry claims that the Off-duty Officers attacked him during this time. The Off-duty Officers deny these allegations.

Close to 3:43 a.m., a fight broke out in the bar's front vestibule. This is where Aaron was hit and suffered a broken nose. Padilla has admitted to throwing the punch that broke Aaron's nose, but Aaron insists that Barnes also punched him in the nose. Camera 1 shows the Off-duty Officers who had allegedly assaulted Barry outside the bar rush toward the vestibule and go inside. The cameras did not capture the fight that occurred. Matthews soon emerged and confronted Barry on the street. Matthews seemed to block Barry's entrance to the bar. While outside during this time, Barry walked normally and held his coat in his hand. He did not appear to be in pain. As Barry walked toward the front door and tried to enter, Matthews pushed him away. Planey again confronted Barry and walked Barry away from the front of the bar and out of

the camera's view. Scott came out of the bar and walked toward Planey and Barry.

Just before 3:46 a.m., Chicago police squad cars arrived on the scene in response to a silent hold-up alarm pressed by Melissa Smith, the shift manager at the bar, as well as a 911 call that Smith placed. The Defendant officers who arrived at the scene yet did not stay to intervene are referred to collectively as the "Responding Officers," and individually by their last names. The first car to arrive was an unmarked maroon vehicle. Several marked vehicles arrived several seconds later.

When Responding Officers Lupo and Collins arrived at the Jefferson Tap, they exited their marked vehicle to survey the situation. Planey approached them and informed them that the Off-duty Officers had the situation under control. As Lupo and Collins returned to their vehicle, Barry approached them and appeared to plead with them to remain and help. Lupo and Collins did not heed Barry's request and left.

After the first wave of police vehicles left, Camera 1 caught who appears to be Kereakes grab Barry. Kereakes pushed Barry south down the sidewalk away from the bar's front door. Matthews, Barnes, and Planey milled around outside the bar. At almost 3:49 a.m., Carlyon and Morabito arrived in a squadroll wagon, appeared

not to exit their vehicle, and left about a minute later. Kingsley arrived shortly thereafter and remained in front of the Jefferson Tap for less than a minute.

Mayoski and Pina arrived next. Bar employee Lindsay Vanderford approached their vehicle and allegedly asked for help. Barnes also approached the vehicle and allegedly told Mayoski and Pina that there had been a minor bar scuffle after Plaintiffs picked on Powers, and that it was "stupid bar stuff." Jefferson Tap owner Jodi Agee ("Agee") approached the car as well and asked for help. Plaintiffs allege that while Agee talked to Mayoski and Pina, Agee could hear a fight taking place south of the bar's front door. Nevertheless, Mayoski and Pina left without exiting their vehicle.

After the Responding Officers drove away from the bar, all of the Plaintiffs were outside of the camera's view south of the bar's entrance. Matthews walked south down the sidewalk away from the bar. Bar co-owner Kevin O'Janovac testified in the criminal case against Planey, Powers, and Barnes that Off-duty Officers and Plaintiffs were fighting at this time. Plaintiffs claim that Matthews chased them toward the lobby of Scott's condominium building, and after they entered the locked door and closed the door behind them, Matthews grabbed the door and forcibly, yet

- 9 -

unsuccessfully, tried to open it.  Defendants contest these allegations.

These events provide the grounds for this lawsuit. Plaintiffs' seven-count Second Amended Complaint asserts a 42 U.S.C. § 1983 excessive force claim against the Off-duty Officers (except Woosley) and the City of Chicago; a § 1983 failure to intervene claim against the Off-duty Officers, Responding Officers, and the City of Chicago; an Illinois state law battery claim against the Off-duty Officers (except Woosley); an Illinois state law assault claim against the Off-duty Officers (except Woosley); an Illinois state law claim of conversion against Planey; and respondeat superior and indemnification claims against the City.  All Defendants move for summary judgment on all counts of this Second Amended Complaint.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is proper if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is material if it could affect the outcome of the suit, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on summary

- 10 -

judgment, the Court does not weigh the evidence or determine the truth of the matter, but determines whether a genuine issue of material fact exists that warrants trial. *See id*. at 249. Further, the Court does not judge the credibility of witnesses. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). In making its summary judgment determination, the Court must view all the evidence and draw any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

The moving party bears the burden of establishing the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial. *See Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). To support their position that a genuine issue of material fact does or does not exist, the parties may cite to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers, or show that

the materials in the record do or do not establish a genuine dispute. FED. R. CIV. P. 56(c).

### III. **ANALYSIS**

### A. **Motions from the Off-duty Officers, Including Barnes and Powers**

The Court can address the Motions for Summary Judgment from the Off-duty Officers and Barnes and Powers in a single analysis. These Defendants attempt a daunting legal feat: securing summary judgment in an excessive force and failure to intervene case in which one Plaintiff suffered a broken nose, another alleges to have hurt his ribs, and, most significantly, copious *video* evidence shows the Defendant Officers fighting with Plaintiffs. While Defendants' attorneys have a duty to be zealous advocates and vigorously defend the claims made against their clients, these Motions appear to be overreaching attempts to redefine the legal standards for summary judgment while conveniently ignoring the evidence that prevents a ruling in Defendants' favor.

Still, let's consider Defendants' arguments. They allege that Barry and Aaron have made an overwhelming number of contradictory and implausible statements about the events that occurred at the Jefferson Tap, so the Court can conclude that Plaintiffs fabricated their allegations. Defendants also contend that the physical

evidence of Barry's injuries is not consistent with that of a man who received a severe beating at the hands of numerous police officers.

As an initial matter, Plaintiffs have moved to strike the Off-duty Officers' Rule 56.1 Statement of Material Facts, arguing that they are "cumbersome, argumentative, improper and untimely." The Court denies this motion, as it can determine the facts relevant to summary judgment and disregard extraneous or improper statements. *See Jenkins v. Spaargaren*, No. 09-C-3453, 2011 WL 1356757, at *2 (N.D. Ill. Apr. 7, 2011).

Moving on, the Court recognizes that Barry offered inconsistent statements under oath about the events at the Jefferson Tap in his statement to the State's Attorney, his deposition in the dramshop action, his deposition for this case, and his testimony at the criminal trial. For example, he stated in his dramshop case deposition that Powers did not hit him in the first alleged attack in the vestibule, while in his deposition for this case he stated that Powers allegedly hit him, although he did not see Powers hit him. (The video shows Powers and Planey confronting Barry in the vestibule, but as previously stated, the camera did not capture what took place during this confrontation.) Such an inconsistency constitutes more than a different level of

detail from one statement to the next, as Barry argues. However, while this and other inconsistent testimony may prove effective for impeachment at trial, Barry has the right to explain these inconsistencies to the jury. *See Hinks v. Graco, Inc.*, No. 91-C-5571, 1993 WL 350193, at *3 (N.D. Ill. Sept. 3, 1993). Also, these inconsistencies do not magically erase the video evidence of Planey pushing Barry against the wall in the vestibule of the bar and of Planey grabbing Barry by the throat and slamming him against the bar's outside wall. These portions of the video, as well as others, speak for themselves. *See Scott v. Harris*, 550 U.S. 372, 378 n.5 (2007). Because of this video evidence, whether Barry alleges that he suffered one, two, or three beatings, and exactly where these alleged attacks occurred, are not dispositive issues in this case.

Barry now admits that Defendants' expert proved that he did not suffer a broken rib during the fight. The fact remains, however, that Barry went to the hospital four days after the incident and complained of rib and back pain, and that a radiologist who examined his x-rays from this visit concluded that Barry may have broken a rib. Defendants contend that Barry must have fabricated all of his stories about being beaten by Defendants because (1) he did not show signs of trauma when paramedics

- 14 -

evaluated him the night of the attack, (2) did not appear to be in pain in the video captured by the Jefferson Tap security cameras, (3) did not show any bruising when he went to the hospital four days later, and (4) was not in pain when he went to the hospital eight days after the attack after vomiting numerous times due to an unrelated bout of gastroenteritis. This lack of bruising and pain may be indicative of the extent of the injuries he received that night, and may impact his damages accordingly. It may also be used for impeachment. Again, the fact that a thin white male did not bruise after an alleged beating by off-duty police officers does not erase video evidence that a reasonable jury could find constitutes excessive force.

The physical pain that Barry may or may not have incurred because of the fight relates to damages, and does not, as Defendants argue, "overwhelmingly contradict" the allegations and demonstrate that Barry is "obviously lying" about the attacks. Such hyperbolic arguments by Defendants, besides reading as disingenuous, ask the Court to make an improper credibility determination. *See Gonzalez*, 578 F.3d at 529. Again, the video captured some of the attacks. Barry has admitted to drinking the night of the fight. His adrenaline levels may have been raised during the fight, and he has testified that he was concerned about

the well-being of his brother inside the bar.  The fact that Barry did not appear to be in pain on the video after his alleged beatings does not show conclusively that Defendants did not attack him.  Barry's inability to show that he suffered a severe injury does not warrant summary judgment.  *See Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008)("Although injury is a relevant factor in determining whether an officer used excessive force, an excessive force claim does not require any particular degree of injury.").  Physical injury, in fact, is not a required element of an excessive force claim.  *See McNair v. Coffey,* 279 F.3d 463, 468 (7th Cir. 2002)(Cudahy, J., concurring).

In this case, the video shows what a reasonable jury could find to be excessive force.  Defendants argue that the evidence outside of the video contradicts Plaintiffs' story to such an extent that a ruling of summary judgment in their favor is warranted.  Contrary to their argument, *Scott v. Harris* does not support their Motions.  In *Scott*, the Supreme Court used a video that showed the respondent driving so fast and recklessly that the video clearly refuted the respondent's argument that he did not drive in a manner that endangered human life.  *Scott*, 550 U.S. at 380-81.  Not to sound like a broken record, but it bears repeating that while Plaintiffs may be ripe for impeachment at trial due to

- 16 -

some seemingly contradictory statements, and the evidence shows that Barry suffered minimal (if any) physical injuries at the hands of Defendants, the video presents evidence that a reasonable jury could conclude constitutes excessive force. The record does not so blatantly contradict Plaintiffs' story so as to preclude such a jury verdict. *See id*. at 380. Defendants ask the Court to create a novel standard for summary judgment in which potentially impeaching statements can eliminate physical evidence that supports Plaintiffs' case. The Court cannot do this.

Moving to Aaron's claims, Barnes argues that the evidence clearly refutes Aaron's allegation that Barnes punched him in the nose during the alternation in the vestibule because (1) Padilla admitted that he punched Aaron in the nose; and (2) the video shows that during the time in which Aaron was allegedly punched in the nose, Barnes was outside the vestibule. First, Barnes asks the Court to assume that Aaron was punched only one time in the nose. Aaron has testified that he was hit multiple times. The video shows Barnes entering the vestibule, and remaining there for an extended period of time. Barnes had plenty of time to punch Aaron. Further, Barnes admits that he had Aaron's blood on his shirt. He argues that the blood landed on his shirt when Aaron spit on him. Aaron denies this allegation. This presents a disputed fact for

- 17 -

the jury. The evidence does not blatantly contradict Aaron's story, so a genuine issue of fact exists in regard to Aaron's allegations against Barnes. Likewise, video evidence appears to show Powers punching Aaron when Aaron was on the ground in the bar. Aaron claims Powers punched him, while Powers denies he did this. This presents another question of fact for the jury.

In regard to the other two Plaintiffs, the video shows Scott being attacked to such an extent inside the bar that he claims to have lost consciousness. Adam testified in his deposition that he was punched or pushed by an Off-duty Officer when the fight broke out inside the bar. The Officers deny these allegations. Again, these issues present disputed material facts. A reasonable jury could look at all of this evidence to support the excessive force claim against the Off-duty Officers in Count I.

In regard to the failure to intervene claim in Count II, § 1983 liability exists for a police officer "who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens . . . if that officer had reason to know . . . that excessive force was being used . . . *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). Because summary

judgment is improper on the excessive force claim, and the video evidence shows that the Off-duty Officers had opportunities to stop this alleged excessive force, genuine issues of material fact exist for the jury on the failure to intervene claim against these Defendants.

As a final matter, Defendants argue that Plaintiffs did not substantively respond to their arguments on the state law battery and assault claims, which necessitates a finding of summary judgment for Defendants on these claims. This argument fails. Plaintiffs' Response Brief focused on the excessive force and failure to intervene claims. While not directly addressing the factors required to maintain their state law battery and assault claims against the assaulting Defendant officers, Plaintiffs implicitly addressed these claims when they addressed the excessive force claims. These claims are inextricably entwined, such that Plaintiffs' arguments against summary judgment on the excessive force claim substantively addressed the state law claims, and created issues of material fact for trial. Accordingly, the Court denies the Motions for Summary Judgment from the Off-duty Officers and Barnes and Powers for all counts in the Second Amended Complaint.

## B. Motion from Responding Officers

- 19 -

Much of the analysis above also extends to the Motion for Summary Judgment from the Responding Officers. Plaintiffs base their failure to intervene claim against the Responding Officers on only the last alleged altercation that occurred after the Responding Officers left the scene. This occurred outside the view of the Jefferson Tap video camera when Plaintiffs allegedly attempted to return to Scott's condominium building. Plaintiffs offer deposition testimony that this altercation took place. Further, Agee testified at her deposition that she heard men screaming in the area in which Plaintiffs claim the final fight occurred, as did O'Janovac during this testimony at the criminal trial. Defendants deny this occurred.

If this final physical fight occurred, then the Responding Officers may be liable on the failure to intervene claim. It must be noted that Plaintiffs agree that Howe and Enriquez should be dismissed as Defendants because no evidence exists that they knew of or had an opportunity to intervene and prevent excessive force. The Court agrees, so Howe and Enriquez are dismissed from the case. However, genuine issues of material fact remain on all of the factors necessary to maintain a failure to intervene claim for the other seven Responding Officers, which precludes an entry of summary judgment in their favor.

- 20 -

The Responding Officers arrived at the Jefferson Tap in response to a battery-in-progress call. When they arrived they saw several off-duty police officers milling around outside the bar. Barry alleges that he told several of the Responding Officers that the Off-duty Officers were involved in the fight. Barnes had blood on his shirt from one of the Plaintiffs. At a minimum, the Responding Officers had constructive notice that the Off-duty Officers may have been involved in the altercation.

The Responding Officers left the scene because they relied on assurances from Planey and Barnes that only a minor alternation had occurred and the situation was under control. Barry alleges, however, that he pleaded with Collins and Lupo for help to protect him from the Off-duty Officers and that he was screaming for help when Mayoski and Pina were at the scene. Agee also asked Mayoski and Pina for help, but they left despite these pleas. Further, the video shows Carlyon and Morabito arrive at the scene in a squadroll wagon, not exit their car despite the battery-in-progress call, and then leave. Kingsley arrived less then a minute later, and stayed for only about one minute. These police officers did not stay at the scene for any appreciable length of time; an issue of fact exists whether this lack of response to a call for help not only violated Chicago Police Department policy, but also constituted a

failure to intervene that subjects the Responding Officers to
§ 1983 liability.

Finally, because they arrived at the Jefferson Tap prior to
the final physical fight that Plaintiffs allege constituted
excessive force, the Responding Officers had a realistic
opportunity to exit their vehicles, survey the scene, take control
of the situation, and prevent this final alleged constitutional
violation from occurring. Accordingly, the Responding Officers'
Motion for Summary Judgment on Count II is denied, with the
exception of Howe and Enriquez, who are dismissed from the case.

### C. Motion from the City of Chicago

Last, the Court addresses Plaintiffs' claims against the City
of Chicago. To maintain their *Monell* claims on the excessive force
and failure to intervene claims in Counts I and II, Plaintiffs must
demonstrate that they (1) suffered a deprivation of a federal
right; (2) as a result of either an express municipal policy,
widespread custom, or deliberate indifference by the Chicago City
Council, which has final policy-making authority for the City of
Chicago; and (3) this custom, policy, or indifference was the
proximate cause of their injuries. *See Monell v. New York City
Dept. of Soc. Servs.*, 436 U.S. 658, 690-92 (1978). The City
concedes that a genuine issue of material fact exists whether it

has a policy and practice of failing to properly investigate incidents of excessive force involving off-duty police officers. Further, as stated above, a genuine issue of material fact exists that Plaintiffs suffered a violation of their constitutional rights. The City argues, however, that no factual dispute exists that the Chicago City Council was deliberately indifferent to the issue of off-duty police officer misconduct, or that this alleged indifference was the proximate cause of Plaintiffs' injuries.

As an initial matter, the City is not entitled to summary judgment on the respondeat superior and indemnification claims in Counts VI and VII, as the Court denied summary judgment on the § 1983 and assault and battery claims against the individual officers in Counts I-IV. Next, the City has tendered two voluminous briefs to argue its objections to the *Monell* claims. Despite these lengthy arguments, the City has failed to establish that no factual issue exists that it was not deliberately indifferent to the issue of off-duty police misconduct. Deliberate indifference requires the choice to follow a particular course of action, or adherence to a failed approach to a problem. *See Johnson v. City of Chicago*, No. 05-C-6545, 2009 WL 1657547, at *9 (N.D. Ill. June 9, 2009). The City argues that two actions taken by the City Council conclusively establish that it addressed the

issue of off-duty police misconduct prior to the December 2006 incident at the Jefferson Tap: (1) it ratified an agreement with the Fraternal Order of Police on March 27, 2002, that included provisions which allowed for the City to improve its investigations of off-duty police misconduct; and (2) by a mandate from the City Council, the Office of Professional Standards (the "OPS") implemented a pattern analysis system that allowed it to improve its police misconduct investigations.

The agreement with the Fraternal Order of Police included new language in Section 8.4 that permitted the City to retain for seven years files of alleged criminal conduct or excessive force even if the charge was not sustained, and stated that "information contained in files alleging excessive force or criminal conduct which are not sustained may be used in future disciplinary proceedings to determine credibility and notice." The City argues that the inclusion of these provisions was the result of significant negotiations with the Fraternal Order of Police. Plaintiffs argue, however, that the City did not effectively implement the pattern analysis provisions in Section 8.4. They offer deposition testimony from Michael Duffy, who the City produced to testify concerning steps the City took to implement Section 8.4. Significantly, Duffy testified that after a draft as

- 24 -

to how the City would implement a pattern analysis policy was written, the draft was never subsequently discussed, and a final draft of the document was never produced. In addition, the City never formally implemented a pattern analysis policy prior to the Jefferson Tap incident. Duffy Dep. 50:7-51:21, May 20, 2010. Further, Duffy testified that the city provided no training to its investigators or supervisors on pattern analysis. *Id*. at 86:10-12. He also testified that he did not know of a case in which pattern analysis was conducted and used in an investigation. *Id*. at 102:13-23. This lack of implementation creates an issue of material fact as to whether Section 8.4 can defeat a claim of deliberate indifference.

The City almost argues against itself in its position that the OPS pattern analysis program that was eventually implemented can defeat summary judgment. It admits that this pilot program was significantly understaffed, with only a single investigator and a part-time assistant. The City also provides pages of detail about how it attempted to use a piece of software from Oracle to automate its pattern analysis program. It appears, however, that this software was not operational until a year after the Jefferson Tap incident, and that implementation of the system was subject to significant delay. Further, automating a system that, according to

facts Plaintiffs have produced, is ineffective does not defeat the deliberate indifference claim.  An issue of fact exists whether the City Council merely paid lip service to the problem rather than substantively addressing the issue.

Plaintiffs' police practices expert, Dennis Waller ("Waller"), reviewed 94 Complaint Register ("C.R.") files with allegations of excessive force by off-duty Chicago police officers from 2003-06, as well as 87 C.R. files with misconduct allegations against the Defendant police officers in this case.  Waller concluded that from 2003 through December 2006, the City made "no significant changes that would impact the effectiveness, efficiency, or improvement of the investigation process."

The City argues, however, that the Court cannot accept his testimony into evidence because it is hearsay.  An expert can testify on the ultimate issue in a case.  FED. R. EVID. 704(a). Further, an expert can base his opinion on inadmissible evidence, such as hearsay.  *Id.* at 703.  The City appears to argue that because Waller's expert report itself is inadmissible as hearsay, he may not offer deposition or trial testimony that relates to the contents of this report.  Plaintiffs have put before the Court excerpts from Waller's deposition that address the contents of his expert report.  If the Court accepted the City argument, it would

- 26 -

become almost impossible to use an expert at summary judgment. Of course, "a party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue, a conclusion for which the expert cannot offer any substantiation when pressed at his deposition." *Am. Int'l. Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996)(Posner, J., dissenting). This, however, is not what Plaintiffs have done. The Court previously ruled that certain portions of Waller's expert report is admissible, and denied the City's motion to bar Waller from testifying at a deposition and at trial. *See* ECF No. 209, Oct. 26, 2010. Waller is a qualified expert in police procedures, and he reviewed a substantial amount of data to form his opinion. His deposition testimony is admissible, and defeats the City's argument that summary judgment is appropriate on the deliberate indifference issue.

Moving to the *Monell* causation prong, the City's argument that Plaintiffs have failed to present facts that the City's deliberate indifference caused their injuries lacks merit. Waller, after reviewing C.R. files from off-duty excessive force complaints, found that the City's disciplinary system lacks a significant deterrent effect due to its lack of effectiveness. Also, a jury

could reasonably interpret the testimony from Matthews that he "doesn't pay attention" to his C.R. files as an admission by a Defendant that the disciplinary system's lax enforcement allowed him to act with impunity and without fear of discipline during the incident with Plaintiffs. Matthews Dep., 235:24-236:21, June 12, 2009. While the City argues that Matthews' testimony can be interpreted only as him not paying attention to the C.R. files because he alleges that he does not do anything wrong, this statement in fact does create a factual dispute on causation that makes summary judgment improper. *See Johnson*, 2009 WL 1657547, at *10. Such a statement is close to a "smoking gun" admission. An actual, unabashed admission would be almost impossible to acquire during discovery, and a requirement to have one to stave off summary judgment would place an unreasonable burden on a plaintiff in a *Monell* claim. Accordingly, the City of Chicago's Motion for Summary Judgment on the excessive force and failure to intervene claims in Counts I and II is denied.

## IV. **CONCLUSION**

For the reasons stated herein, the Court denies the Motions for Summary Judgment from the Off-duty Officers, Barnes and Powers, Responding Officers, and the City of Chicago. Plaintiffs' Motion

to Strike is denied.   Responding Officers Howe and Enriquez are

dismissed from the case with prejudice.

**IT IS SO ORDERED.**

_____
                Harry D. Leinenweber, Judge
                United States District Court

**DATE:** 9/9/2011

- 29 -