**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BARRY GILFAND, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **07 C 2566** |
| **v.** | ) | |
| | ) | **Judge Leinenweber** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>DEFENDANT CITY OF CHICAGO'S MOTION *IN LIMINE* NO. 1 TO BAR
CERTAIN TESTIMONY OF PLAINTIFFS' EXPERT WITNESS DENNIS WALLER</u>**

# Exhibits

# EXHIBIT A

Case: 1:07-cv-02566 Document #: 370-1 Filed: 04/18/13 Page 3 of 57 PageID #:2624
Case: 1:07-cv-02566 Document #: 217 Filed: 12/22/10 Page 1 of 57 PageID #:2267

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT. |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

1

2

3

4    BARRY GILFAND, AARON GILFAND,          )
     ADAM MASTRUCCI, and SCOTT             )
5    LOWRANCE,                             )
                                          )
6              Plaintiffs,                 )
                                          )
7    vs.                                   )    No. 07 C 2566
                                          )
8    SERGEANT JEFFREY PLANEY,              )    Chicago, Illinois
     OFFICER GREGORY BARNES,               )    October 26, 2010
9    OFFICER DEMETRIOS KEREAKES,           )    9:00 o'clock a.m.
     OFFICER VINCENT MATTHEWS,             )
10   OFFICER MATIAS PADILLA,               )
     OFFICER PAUL POWERS,                  )
11   OFFICER ERIKA WOOSLEY,                )
     SERGEANT DALE KINGSLEY,               )
12   OFFICER KENNETH CAROLYN,              )
     OFFICER FREDERICK COLLINS,            )
13   OFFICER NICOLE MAYOSKI,               )
     OFFICER ANA PINA,                     )
14   OFFICER DONALD LUPO,                  )
     OFFICER GREGORY MORABITO,             )
15   OFFICER MICHAEL HOWE,                 )
     OFFICER JESUS ENRIQUEZ, and           )
16   THE CITY OF CHICAGO,                  )
                                          )
17             Defendants.                 )

18

19              TRANSCRIPT OF PROCEEDINGS - RULING
           BEFORE THE HONORABLE HARRY D. LEINENWEBER
20

21   APPEARANCES:

22

23   For the Plaintiffs:     SMITH, JOHNSON & ANTHOLT
                             MR. CHRISTOPHER R. SMITH
24                           112 South Sangamon Street
                             Chicago, Illinois 60607
25                           312-432-0400

<pre>
 1    For the Defendants,      MAYER BROWN LLP
      Barnes and Powers;       MR. AARON CHAIT
 2                             MS. JESSICA L. FELKER
                               71 South Wacker Drive
 3                             Chicago, Illinois 60606
                               312-782-0600
 4

 5
      For the Defendant,       CITY OF CHICAGO
 6    City of Chicago:         DEPARTMENT OF LAW
                               MR. GEORGE J. YAMIN, JR.
 7                             30 North LaSalle Street
                               Chicago, Illinois 60602
 8                             312-742-0234

 9

10    Court Reporter:          FEDERAL OFFICIAL COURT REPORTER
                               MS. KRISTA FLYNN BURGESON
11                             219 South Dearborn Street
                               Chicago, Illinois 60604
12                             312-435-5567

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

Case: 1:07-cv-02566 Document #: 327-1 Filed: 04/18/13 Page 5 of 57 PageID #:7336
Case: 1:07-cv-02566 Document #: 217 Filed: 12/22/10 Page 3 of 57 PageID #:2269

3

 1          THE CLERK:  07 C 2566, Gilfand versus Planey.

 2          THE COURT:  Good morning.

 3          MR. SMITH:  Good morning, your Honor.  Christopher

 4   Smith on behalf of the plaintiffs.

 5          MR. YAMIN:  Good morning, your Honor.  George Yamin

 6   on behalf of defendant City of Chicago.

 7          MS. FELKER:  Good morning, your Honor.  Jessica

 8   Felker and Aaron Chait on behalf of defendants Gregory Barnes

 9   and Paul Powers.

10          MR. CHAIT:  Good morning.

11          THE COURT:  This is a ruling on the motion to strike

12   portions of the plaintiffs' expert witness report.

13          Plaintiffs retained Dennis Waller to prepare an

14   expert report on the Chicago Police Department's officer

15   misconduct investigation and discipline policies, patterns,

16   and practices.  According to the background and qualifications

17   section in his July 16, 2010, written report, Waller has

18   served as an expert witness and consultant on more than 475

19   cases related to police policy, procedure, and practice; has

20   received more than 3,100 hours of law enforcement training;

21   has worked as a police officer, field training officer,

22   detective, sergeant, lieutenant, department training officer,

23   and chief of police; and is a certified police training

24   instructor in 4 states.

25          To prepare his report Waller reviewed, among other

1  information, pleadings and various material related to the

2  litigation at hand, as well as a substantial quantity of

3  material concerning the Chicago Police Department's training,

4  evaluation, adjudication, and discipline procedures as they

5  relate to police misconduct.  The City of Chicago has filed

6  the motion before the Court to strike portions of Waller's

7  written report, as well as to bar Waller from offering any

8  deposition and trial testimony on the excluded subjects.

9        A qualified expert witness may testify in his area of

10  expertise as it relates to a case if "(1) the testimony is

11  based on sufficient facts or data, (2) the testimony is the

12  product of reliable principles and methods, and (3) the

13  witness has applied the principles and methods reliably to the

14  fact of the case." Federal Rule of Evidence, 702.

15        The trial court serves as a gatekeeper to ensure the

16  relevance and reliability of expert testimony.  Kumho Tire,

17  526 U.S. at 147.  To be relevant, the testimony must assist

18  the trier of fact in understanding the evidence or determining

19  a fact in issue.  Daubert, 509 U.S. at 591.  The testimony

20  must also have "a reliable basis in the knowledge and

21  experience of [the expert's] discipline." Daubert, 509 U.S.

22  at 592.  A court should exclude expert testimony if it does

23  not meet these conditions.

24        The City has asked the Court to strike only Sections

25  A and C.1 of Waller's report (except for Subsection C.1.a, to

1   which it does not object), as well as to modify the language
2   in Section B.

3        Section A of the report reads:  "The City of Chicago
4   has been on notice, and continues to be aware, that the
5   administrative investigation and discipline system designed to
6   ensure police officer compliance with the Chicago Police
7   Department policies, procedures, rules, regulations, and the
8   law is inefficient and ineffectual."  The City asks the Court
9   to strike this section in its entirety, because it relates to
10  the Chicago City Council - not the Chicago Police Department
11  or the police's interaction with the City Council - and
12  therefore, does not fall within the scope of Waller's
13  expertise.

14       Neither Waller's resume nor any other material in his
15  report demonstrate that he is qualified as an expert in city
16  counsel procedure or communications.  His experience in police
17  policy and procedure does not translate into expertise
18  regarding what events would place the Chicago City Council on
19  notice of police policies and procedures.  Therefore, using
20  the principles set forth in Rule 702 and enunciated in
21  <u>Daubert</u>, his testimony in this area would lack reliability.

22       Plaintiffs argue that allowing Waller to testify as
23  to events in the Chicago City Council would provide an
24  efficient means by which the jury can become familiar with the
25  voluminous material relating to the City Council's knowledge

Case: 1:07-cv-02566 Document #: 3207-1 Filed: 04/18/10 Page 8 of 57 PageID #:22729
Case: 1:07-cv-02566 Document #: 3217-1 Filed: 12/22/10 Page 6 of 57 PageID #:22729

6

1   of the shortcomings of the police investigation and discipline

2   system.  This does not address Waller's inexperience in this

3   subject.  His opinion regarding these events would not assist

4   the trier of fact.  Plaintiffs cannot cloak Waller as an

5   expert in this realm for the mere sake of judicial efficiency.

6   Rather, plaintiffs must find another way to present this

7   information to a jury.  Section A is therefore stricken from

8   Waller's report.

9        The same notice issue emerges in the City's objection

10  to Section B of the report.  The City objects to the language

11  in this section that asserts that the 2003 case of _Garcia_

12  _versus City of Chicago_ placed the City on notice that its

13  "internal investigation system was inadequate, ineffectual,

14  and encourages or condones officer misconduct."  As previously

15  stated, Waller does not qualify as an expert on the

16  inner-workings of Chicago City government or communications.

17  Therefore, this notice assertion must be removed from the

18  report.  As for the City's other objection to Section B, the

19  parties have agreed that it should not state that _Garcia_

20  "established" certain factual findings.  The parties have come

21  to a proper compromise, because Waller could not offer expert

22  testimony on such a legal conclusion.  See _Good Shepherd Manor_

23  _Foundation, 323 F. 3d at 564_.  The City's proposed revision of

24  Section B would be admissible, as it removes the notice

25  element as well as the assertion that _Garcia_ established fact

1   findings.  The parties should agree on a construction of

2   Section B that is consistent with this ruling.

3          Moving to Section C.1, the City argues that besides

4   Subsection C.1.a, it should be stricken because this testimony

5   does not fall within the purview of an expert.  In this

6   section, Waller concludes that the pattern analysis used by

7   the Chicago Police from the 2003 Garcia decision to December

8   15, 2006, had little or no effect on its internal

9   investigation and discipline process.  The City argues that

10  because the same testimony upon which Waller relied to form

11  his opinion could be obtained through cross examination, the

12  opinion and the stated bases should be a matter for the jury

13  to decide.

14         The Court disagrees with the City's analysis.  Using

15  the Daubert framework, the testimony is relevant as it

16  addresses the plaintiffs' Monell claim.  Next, it is reliable,

17  as Waller has used a substantial quantity and breadth of

18  information directly related to the issue to formulate this

19  opinion, and he is qualified as an expert in police misconduct

20  investigation and discipline processes and procedures.  This

21  specialized knowledge is a proper topic for an expert, and it

22  is proper for Waller to include in his report the bases for

23  his opinion - even if they could be procured through trial

24  testimony.  The Court, therefore, denies the City's motion to

25  strike Section C.1.

Case: 1:07-cv-02566 Document #: 370-1 Filed: 04/12/16 Page 10 of 57 PageID #:7331
Case: 1:07-cv-02566 Document #: 29-7 Filed: 12/22/16 Page 8 of 15 PageID #:2274

8

1    Finally, the City has asked the Court to bar Waller

2    from offering any trial or deposition testimony on the

3    materials stricken from his expert report.  The Court denies

4    this motion.  In regard to depositions, if Waller testifies on

5    matters that involve the stricken material, the City should

6    make any objections at the time of the examination so it is on

7    the record.  Federal Rules of Civil Procedure, 30(c)(2).  As

8    far as trial testimony, it would be premature to bar such

9    testimony.  If the Court were to make such an order, it would

10   come pursuant to a motion in limine, not at this early stage

11   of the litigation.

12   For the reasons stated above, defendant's motion to

13   strike is granted in part and denied in part, and its motion

14   to bar deposition and trial testimony is denied.

15   MR. SMITH:  Thank you, your Honor.

16   THE COURT:  What is next?  Do we have a trial date?

17   MR. YAMIN:  We are far from that, but closer than we

18   were.

19   I think the most relevant matters for a status report

20   are, speaking from the City's point of view, plaintiffs'

21   expert, Mr. Waller, the subject of the motion and your

22   opinion, is scheduled for a deposition on Friday, November

23   12th.  So we are going forward with his deposition to the best

24   of my knowledge on that date.

25   Now, on November 15th, that is the date for the City

Case: 1:07-cv-02566 Document #: 370-1 Filed: 04/12/13 Page 11 of 57 PageID #:7252
Case: 1:07-cv-02566 Document #: 291-1 Filed: 12/22/10 Page 9 of 15 PageID #:2275

9

1   to disclose its expert.  We have identified or will be

2   disclosing Jeffery Noble, who can testify as to matters

3   related to investigation and discipline.

4           However, because of the short timeframe, which

5   actually is just a weekend between Mr. Waller's deposition on

6   November 12th and the City's expert disclosure date on

7   November 15th, I would make an oral motion for a brief

8   extension in terms of the disclosure of our expert from

9   November 15th to November 22nd, and the reason for that is

10  this, your Honor.  Our expert has indicated an interest, which

11  we support wholeheartedly, in reviewing Mr. Waller's

12  deposition transcript prior to disclosing his final written

13  report in the event that possibly, even likely, that there

14  will be matters that Mr. Waller will have testified to that

15  are relevant to our expert's opinions.

16          So, we would ask for that additional 7 days to

17  disclose our expert.

18          THE COURT:  Any objection?

19          MR. SMITH:  It sounds like a reasonable amount of

20  time.

21          THE COURT:  All right.

22          The 22nd then.

23          MR. YAMIN:  Thank you, your Honor.

24          THE COURT:  Okay.

25          MR. YAMIN:  And then after that I think -- I am not

Case: 1:07-cv-02566 Document #: 327-1 Filed: 04/18/12 Page 12 of 57 PageID #:7393
Case: 1:07-cv-02566 Document #: 317 Filed: 12/22/10 Page 10 of 17 PageID #:2276

10

1  sure we have any dates, and I think there will be summary

2  judgment motions filed.  I know that the City will file one on

3  the Monell claim.  I believe the defendant officers who were

4  not in the Jefferson Tap & Grill who responded to the call of

5  -- to the 911 calls, I believe they will file a motion as

6  well.  Their counsel is absent today, but he has indicated

7  that there is a motion forthcoming from those defendants.

8           I can't speak for the other --

9           THE COURT:  Well, let's do this.

10          I will set the status in early December and we will

11  set a briefing schedule on your motions.

12          MR. YAMIN:  I think that makes sense.

13          Am I missing anything?

14          MR. CHAIT:  No.

15          THE CLERK:  December 7th at 9:00.

16          MR. YAMIN:  Excuse me one second, please.

17          That is okay with me.

18          MR. SMITH:  Yes.

19          Thank you, Judge.

20          THE COURT:  All right.

21          And it is December 7th, Pearl Harbor Day for you

22  older people.

23          MR. YAMIN:  Thank you.

24          (Proceedings concluded.)

25

Case: 1:07-cv-02566 Document #: 370-1 Filed: 04/29/12 Page 13 of 57 PageID #:7334
Case: 1:07-cv-02566 Document #: 217 Filed: 12/22/10 Page 11 of 17 PageID #:2277

11

1               C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     /s/Krista Burgeson, CSR, RMR, CRR     October 26, 2010
      Federal Official Court Reporter      Date
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

# WALLER & ASSOCIATES, LLC

14665 W. Lisbon Road, Suite 2F
Brookfield, Wisconsin 53005
(262) 782-5515 · Fax (262) 782-5521

July 16, 2010

Attorney Amanda Antholt
Smith, Johnson & Antholt, LLC
112 S. Sangamon Street
3rd Floor
Chicago, IL   60607

Re:      **Gilfand, et al. v. Planey, et al.**

Ms. Antholt:

The following report is being presented per your request for my opinions on various issues related to this litigation.

## *Background and Qualifications:*

I have served as a consultant/expert witness in more than 475 cases involving issues related to police policy, procedure, and practice. I have been retained in thirty-two states and have served as an expert witness in federal courts, state courts, and before administrative hearings. The split on the cases in which I have been retained is approximately 55% defense; 45% plaintiff.

I have a Bachelor of Science degree in police administration from Michigan State University. I have a Master of Science degree in public administration from Florida International University. I have received over 3,100 hours of law enforcement training.

I have served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief of police. I have been certified as a police training instructor in Michigan, Florida, North Carolina, and Wisconsin. I have served as the director of a regional police training academy. I have been certified as a Defensive and Arrest Tactics Instructor and Psycho-Motor Skill Design Instructor. I have been trained as an assessor for the Commission on Accreditation for Law Enforcement Agencies. Throughout my years as a trainer and supervisor, I have trained hundreds of officers in numerous subject areas including police-citizen interaction, criminal investigation, use of force, and ethical conduct.

Attorney Amanda Antholt
July 16, 2010
Page 2

I have taught in a variety of law enforcement and related subject areas at the college and university level including the police function, police administration, criminal investigation, and policy development seminars in high liability areas such as the use of force and internal investigations.

Please refer to the attached curriculum vitae.

**Materials Reviewed:**

      Second Amended Complaint;
      Plaintiffs' Answer to Second Set of Interrogatories;
      Defendant City's Objections & Answers to Request for Admission;
      Defendant City's Amended Answers to Interrogatories;
      Defendant City's Objections & Answers to Interrogatories;
      Defendant City's Objection & Responses to Requests for Production;
      Chicago PD Rules and Regulations;
      OPS SOP Manual;
      FOP Contract through 6/30/03;
      Interest Arbitration Opinion and Award – 2/5/02;
      DVD recording of events at the Jefferson Tap;
      June 19, 1999, City Council Resolution re. Chicago PD's use of excessive force;
      Amendment to the Municipal Code of Chciago re. Police/Citizen Encounters;
      Chicago PD Officer Complaint Histories:
            Officer Vincent Matthews;
            Officer Gregory Barnes;
            Sgt. Dale Kingsley;
            Officer Frederick Collins;
            Sgt. Jeffery Planey;
            Officer Jesus Enriquez;
            Officer Demtrios Kereakes;
            Officer Matias Padilla, Jr.;
            Officer Paul Powers;
            Officer Vincent Matthews;
            Officer Erika Woosley;
            Officer Kenneth Carlyon;
            Officer Nicole Mayoski;
            Officer Michael Howe;
            Officer Ana Pina;
            Officer Donald Lupo;
            Officer Gregory Morabito;

Attorney Amanda Antholt
July 16, 2010
Page 3

    Chicago PD General Orders:
       GO 93-03 – Complaint and Disciplinary Procedures;
       GO 92-03 – Weapons, Department and Personal;
    Investigative File – CR 1002796;
    Investigative File – CR 1002011;
    OPS Investigator Shannon Hayes – Deposition;
    OPS Administrator Michael Duffy – Deposition – Parts I & II;
    Rule 26 report of Dennis Waller - <u>Garcia v. City of Chicago, et al.</u>;
    87 CR Files involving other investigations of the accused Chicago Police officers;
    94 CR Files involving alleged off-duty misconduct.

### *Understanding of the Facts:*

On December 15, 2006, near closing time plaintiffs were playing pool at the Jefferson Tap. Also in the bar were a number of off-duty Chicago Police [CPD] officers. Both the officers and plaintiffs had been drinking. At least one member of the off-duty CPD officers was armed. A surveillance tape from the bar does not indicate any interaction between the two groups until the off-duty CPD officers started to leave. According to independent witness accounts and the surveillance tape, several of the off-duty CPD officers attacked and injured the plaintiffs.

One plaintiff attempted to call the Chicago Police Department for assistance but his cell phone was taken away from him by Sgt. Planey, an off-duty CPD officer. Personnel at the bar made calls and activated an emergency alarm system in attempts to obtain assistance from the Chicago Police Department. Numerous CPD units responded to the location but did not investigate the matter and/or were waved off by Sgt. Planey, who some responding officers knew to be a plainclothes CPD sergeant.

Despite attempts by the plaintiffs and bar staff to obtain police assistance, no overt attempt was made by the responding units to investigate the situation at the Jefferson Tap. The responding units drove by the location or turned around and left the area without taking steps to investigate the multiple calls dispatched to the Jefferson Tap. According to Office of Professional Standards [OPS] Investigator Shannon Hayes, who made a transcript of the OEMC recording, the calls were dispatched as follows:

| | |
|---|---|
| 3:42:14 | "Units in 012 and Citywide, we have a holdup alarm at 325 N. Jefferson at the Jefferson Tap and Grill. The bar cash register." |
| 3:44 | "I'm going to have someone roll with you. It looks like a big old fight over there. We're getting a call of a battery in progress at the tavern at 325 N. Jefferson, Jefferson Tap and Grill." |

Attorney Amanda Antholt
July 16, 2010
Page 4

3:59:48          "In that Jefferson Tap and Grill again. Units in 012 and Citywide,
                 325 N. Jefferson, males are fighting inside the bar. 012th District,
                 Zone 13."

Two Complaint Registers [CR] were subsequently filed and OPS Investigator Hayes was
assigned to conduct the related investigations. CR #1002011 deals with an investigation
of the use of excessive force by the off-duty officers inside the Jefferson Tap. CR
#1002796 deals with the failure to provide police service. Although initiated in
December 2006 and January 2007 respectively, both investigations remain open and
unresolved.

**Opinions:**

Based on the totality of my training, education, and experience in law enforcement; as a
trainer; as an educator; and, as a consultant, I have developed the following opinions to a
reasonable degree of professional certainty in the field of police practice.

A       The City of Chicago has been on notice, and continues to be aware, that the
        administrative investigation and discipline system designed to ensure police
        officer compliance with Chicago Police Department policies, procedures, rules,
        regulations, and the law is inefficient and ineffectual.

        1       A Chicago City Council resolution was presented by Alderperson Dorothy
                Tillman and supported by numerous other members of the City Council on
                June 9, **1999**, stated in part:

                Citizens have called upon elected officials to take action to protect citizens
                from the actions of errant police officers.

                Citizens continue to raise concerns about policies pertaining to the
                appearance of a lack of accountability by the Chicago Police Department.

        2       A Chicago City Council resolution regarding the police contract presented
                by Alderman William Beavers prior to the **2002** contract signing stated in
                part:

                "The Agreement makes it very difficult, if not impossible, for the
                management of the Department to exercise its basic responsibility for
                holding employees accountable for their behavior. It establishes an

Attorney Amanda Antholt
July 16, 2010
Page 5

environment where police officers who do not carry out their
responsibilities in a professional manner have ample reason to believe that
they will not be held accountable even in intances [sic] of egregious
misconduct.....The agreement undermines the proper and necessary role
of management....."

Whistle blowing is discouraged.

The disciplinary process called for in the agreement is lengthy and
duplicative and hamstrings management. "Prolonged series of inquiries,
determinations, and hearings which a police officer may invoke before
there is any possibility of discharge of discipline beyond a 30-day
suspension....is so perplexing, cumbersome, and dilatory that the
employer must think ten times before pushing a case to end, and the
employee unit must realize ten times over that the chance of the matter
going all the way is slim....."

3       The February 5, 2002, Interest Arbitration and Award for the contract
        between the City of Chicago and the FOP [p. 87] stated:

        "In the Chicago Police Department over the years, that timeliness
        principle has been lost. Layer upon layer of review and appeal procedures
        have been incrementally laminated upon one another, so that the
        evolutionary result is an overly-complex series of mechanisms that
        collectively have put the brakes on timely discipline and swift resolution
        of related appeals."

        The panel further quoted the Webb Commission Report which stated:

                "....the amount of time that passes between an infraction of the
                Department's rules and the imposition of a sanction sends the
                message that the misconduct is not being taken seriously."

                "....the Commission is confident that a more efficient and less
                time-consuming disciplinary process will be better for all of the
                Department's members."

4       At the November 29, 2005, Police and Fire Committee Meeting, Alderman
        Howard Brookins, Jr., proposed amending the Municipal Code of Chicago
        with regard to Chicago Police Department civilian encounters to require:

Attorney Amanda Antholt
July 16, 2010
Page 6

The creation of an automated, computer-based 'early warning system;

Reducing the disciplinary process involving allegations of misconduct against police officers to no more than four stages;

Protecting officers who provide information about misconduct by another police officer from reprisals;

Requiring OPS and/or IAD to accept and investigate anonymous complaints of police officer misconduct;

Retaining all records of civilian complaints against a police officer for as long as the officer is employed;

Eliminating a time limit for the filing of civilian complaints alleging police officer misconduct; and,

Including in the annual report the number and type of CR's, who investigated the complaints, the disposition by category, the punishment recommended at each phase of the process, and the actual punishment meted out.

B       The City of Chicago has failed to take meaningful and appropriate actions to systematically investigate and regulate allegations of off-duty officer misconduct despite being placed on notice in 2003 with reference to the <u>Garcia v. City of Chicago, et al.</u> case that their internal investigation system was inadequate, ineffectual, and encouraged or condoned officer misconduct. <u>Garcia</u> established in part:

1       Chicago Police Department personnel discouraged or ignored attempts by citizens to file complaints against CPD personnel. In actual widespread practice the Chicago Police Department has tended to conceal officer misconduct and discourage outside examination.

2       Absent extraordinary circumstances such as an arrest by another agency, Chicago Police personnel are unlikely to be effectively charged with a crime, or if charged, have the crime investigated in the same manner as if the accused were a private citizen.

Attorney Amanda Antholt
July 16, 2010
Page 7

3    Lengthy, unwarranted delays in the internal investigation process and
     incomplete or inadequate investigations are the rule rather than the exception.
     The overall quality of OPS investigations reviewed indicates a pattern
     displaying incompleteness, inadequacy, and a process so drawn out over time
     that they have little or no deterrent effect with regard to police misconduct.

4    The actual practice of the Chicago Police Department in condoning and
     accepting apparent institutionalized delays in investigating off-duty police
     officer misconduct is contrary to the stated policy of the Chicago Police
     Department and nationally accepted standards of police practice.

5    OPS personnel have failed to adequately investigate officer misconduct.
     "OPS investigations are generally disorganized compilations of information
     which provide the appearance, rather than the substance, of a sound
     investigation. The purpose of an investigation should be to determine the
     truth of what happened…..OPS investigations are not conducted to determine
     the truth of what happened….."

6    Despite being required by CPD policies and procedures and general and
     special orders to immediately report misconduct whether it is directly
     observed by them or reported to them by another individual, Chicago Police
     personnel actively conceal or ignore officer misconduct and are rarely held
     accountable for doing so.

7    The standard of practice for effective internal investigations requires that
     everything must be done to bring the investigation to a speedy and definite
     conclusion. Chicago Police Department investigations are neither speedy nor
     conclusive. Lou Reiter's Law Enforcement Administrative Investigations: A
     Manual Guide, was used by the City's expert in Garcia as a reference and
     authoritative source. The first edition of that manual [Preface] states: "Swift,
     certain and fair discipline protects the reputation of the agency and ensures
     that all police employees can work in an environment of pride and
     professionalism." Discipline in the Chicago Police Department is not swift,
     certain, or fair.

8    The Commission on Accreditation for Law Enforcement Agencies [Standard
     52.1.1] recommends that all complaints against the agency or its employees be
     investigated. Lou Reiter [p. 1] stated "The openness of the agency to the
     acceptance of a complaint is a principal element of police professionalism and

Attorney Amanda Antholt
July 16, 2010
Page 8

community responsiveness. The seventy-two OPS files reviewed for the Garcia case provided numerous examples of CPD personnel refusing to accept, or actively discouraging the acceptance of, complaints involving off-duty police officers.

C     "Nothing" since Garcia [2003] to the present case [December 15, 2006] has changed to substantively improve the manner in which internal investigations are conducted and discipline dispensed for the sworn personnel of the Chicago Police Department.

    1    The limited and severely restricted form of pattern analysis provided for in Section 8.4 of the contract has had little, or no, practical effect in the internal investigation and disciplinary process.

        a    Based upon my review of 181 CR files of OPS investigations conducted for analysis of this matter, I have found no indication within the files reviewed that pattern analysis is being used whatsoever, let alone in any type of significant manner.

        b    Investigator III Shannon Hayes, the OPS investigator assigned to investigate the CR files which are the subject of this matter, stated in her sworn deposition:

            1)    Ms. Hayes has heard of pattern analysis in OPS using an officer's prior "not sustained" complaints to determine credibility. [p. 80]

            2)    Ms. Hayes has heard people talk about pattern analysis. She has not seen any written policies or procedures about doing pattern analysis. She has not conducted any pattern analysis. [p. 81]

        c    Former OPS Acting Administrator Michael Duffy stated in his sworn deposition:

            1)    Pattern analysis is very laborious and time consuming to do. [p. 232]

            2)    Mr. Duffy admitted OPS investigators do not do pattern analysis unless they need to. [p. 26]

Attorney Amanda Antholt
July 16, 2010
Page 9

    3)    Pattern analysis was <u>not</u> included in the OPS SOP Manual.
[p. 84] <u>No</u> training was provided to OPS investigators
about how to conduct pattern analysis. [p. 86] There was a
draft procedure, but <u>no</u> OPS policy for pattern analysis. [p.
93] The draft procedure was <u>not</u> distributed to the OPS
investigators. [p. 77]

    4)    Mr. Duffy was <u>not</u> aware of any instance where pattern
analysis has been documented in a CR file. He was <u>not</u>
aware of any instance where a CPD officer was interviewed
by OPS about a pattern of behavior. [p. 177]

d.  Even in those limited situations where pattern analysis has been
conducted by OPS, it was not used effectively to enhance the
investigation of misconduct and the disciplinary process.

    1)  Initially in 2003, pattern analysis was conducted on a group of
27 CPD officers identified by criteria within certain parameters
as having been accused of misconduct and potentially facing
the disciplinary process for future incidents.

    2)  One of the officers in the original group, Tracy Quarles had a
pattern of domestic abuse. There was an additional incident in
which Officer Quarles was arrested for shooing his girlfriend in
the foot. Mr. Duffy was [p. 192] was unsure if the pattern
analysis was conducted for the original sample or again for an
on-going problem involving domestic abuse. Regardless,
pattern analysis was conducted for Officer Quarles but not
submitted to the Police Board.

      a)  The CR against Officer Quarles was sustained and
separation from the Chicago Police Department was
recommended. [p. 194]

      b)  The Police Board did <u>not</u> decide on termination.

      c)  Mr. Duffy admitted [p. 196] that the pattern evidence,
which was not submitted to the Police Board, could have
been further evidence to be used against Officer Quarles in
the termination proceedings.

Attorney Amanda Antholt
July 16, 2010
Page 10

3) Federal authorities conducted an investigation [a form of pattern analysis] into the activities of CPD officers Flagg and Jones from 1999 to 2005. These officers were subsequently indicted in federal court in 2005.

    a) Mr. Duffy [p. 182] was <u>not</u> aware if the pattern analysis conducted by OPS on Officers Flagg and Jones had ever been utilized by the department in any type of investigatory or disciplinary process prior to 2005.

    b) Mr. Duffy [the City's 30 (b)(6) witness] had no firsthand knowledge [p. 183] if the Chicago P.D. had any involvement in revealing information about the criminal conduct of Officers Flagg and Jones to federal authorities.

4) Mr. Duffy admitted the 2003 pattern analysis by OPD found a pattern of misconduct by Officer Bora.

    a) Media in 2009 named Officer Bora Chicago's worst cop because he had racked up over $4 million in settlements and judgments.

    b) Mr. Duffy [pp. 184-185] was not aware whether the pattern analysis of Officer Bora was ever utilized by the department in any investigatory or disciplinary proceedings.

2    A comparison of the manner in which the City of Chicago has conducted administrative investigations pre-2003 through the end of 2006 indicated <u>no</u>, significant changes that would impact the effectiveness, efficiency, or improvement of the investigation process.

    a    There are strong indications within the files reviewed that CPD personnel continue to discourage and/or ignore attempts by citizens to file complaints. This matter is an excellent case in point.

Attorney Amanda Antholt
July 16, 2010
Page 11

    b    Absent extraordinary circumstances such as an arrest by another
agency, CPD personnel are unlikely to be effectively charged with
a crime or be subjected to administrative sanctions.

        1)   Of the 94 CR files provided through the discovery process
alleging off-duty misconduct only 13 were sustained.

        2)   Of the 13 cases sustained, four cases involved the arrest,
investigation, and/or intervention by other law enforcement
agencies. Five cases involved conduct so outrageous that it
would have been extremely difficult to conceal and/or
mitigate. One case involved a non-sworn civilian
employee.

    c    The overall quality of OPS investigations is so incomplete and
inadequate they have little or no deterrent effect with regard to
police misconduct.

        1)   In 27 of the 94 CR files provided through the discovery
process, the involved off-duty officers were listed as unknown.
In 7 of these CR files, the accused officer was known but not
listed. In 9 of the CR files diligent efforts to investigate the
matter, if taken, could very likely have resulted in the identity
of the officers.

        2)   The following cases are illustrative of little or no investigative
effort being made by OPS personnel:
           a)  CR #301191
           b)  CR #301639
           c)  CR 3303105
           d)  CR #307918
           e)  CR #309308
           f)  CR #310238
           g)  CR #313820
           h)  CR #311568
           i)  CR #307045
           j)  CR #307180
           k)  CR #286764
           l)  CR #287974
           m) CR #289364

Attorney Amanda Antholt
July 16, 2010
Page 12

    d.    Further detracting from the deterrent effect is the tendency for OPS investigations to be drawn out over time.

        1)    The actual practice of the City of Chicago continues to be condoning and accepting institutionalized delays in investigating off-duty police officer misconduct.

        2)    Of the thirteen sustained cases within the 94 CR files previously mentioned, the average time from the filing of the complaint until resolution was 786 days, which equates to slightly more than two years per sustained investigation.

        3)    The two CR investigations which are the subject of this case have remained unresolved since they were reported in December 2006 and January 2007 respectively.

    e    Examination of the CR files provided through discovery indicate the OPS investigations continue to be generally disorganized compilations of information providing the appearance, rather than the substance, of a sound investigation.

    f    As starkly represented in the matter at hand, as well as from a review of the CR files provided through discovery, there is clear evidence of a widespread practice among CPD personnel to conceal, ignore, and prevent accountability for off-duty officer misconduct.

    g    Although General Order 93-03 states: "The Superintendent is charged with the responsibility and has the authority to maintain discipline within the Department.....Prompt, thorough investigations will be conducted into allegations of misconduct to establish facts which can absolve the innocent and identify the guilty." This simply has <u>not</u> been done in the City of Chicago.

4    Virtually every CPD officer interviewed for the CR's currently under consideration, whether a witness or accused, stated he/she was not making his/her statement to OPS voluntarily, but under duress. Each officer stated they objected to the investigation because as of August 2004, all complaints against any sworn peace officer must be accompanied by a

Attorney Amanda Antholt
July 16, 2010
Page 13

sworn affidavit. Further, many of the current OPD investigations of CR files reviewed for this matter were prematurely or unnecessarily terminated, or determined to be unfounded, based upon no sworn affidavit or the complainant declining further cooperation.

a    Lou Reiter, who was considered an authoritative source by the City's expert witness in the Garcia matter, stated in Law Enforcement Administrative Investigations, 3rd Ed., 2006, p. 2.2, that complainants should not be required to swear under oath to the truthfulness of their complaint. "The myriad of national study commissions such as the 1968 Kerner Commission, 1973 Police Task Force of the National Advisory Commission on Criminal Justice Standards and Goals, and those following have all reiterated the necessity for police agencies to remove all unreasonable barriers to persons who desire to make complaints of grievances they may have with the agency. These study commissions have labeled these barriers as hurdles, obstructions, hindrances and methods of intimidation." [p. 2.6]

b    Lou Reiter further stated that the law enforcement agency should continue the investigation to the *extent possible* even if the complainant withdraws his/her assistance. "The cooperation of the complainant is important and desired, but it is not mandatory." [p. 2.4]

c    The International Association of Chiefs of Police *Model Policy for Complaint Review* states the recommended policy is to investigate all complaints of alleged officer misconduct, to equitably determine whether the allegations are valid or invalid and to take appropriate action. "All citizen complaints pertaining to departmental policies or procedures or that allege officer misconduct shall be documented and investigated by the department."

d    The Commission on Accreditation for Law Enforcement Agencies, *Internal Affairs Standard 52.1.1* states in part: "A written directive

Attorney Amanda Antholt
July 16, 2010
Page 14

requires all complaints against the agency or its employees be investigated, to include anonymous complaints."

4      The City of Chicago has <u>knowingly failed</u> to provide the necessary resources to consistently conduct prompt, thorough investigations into allegations of misconduct [CPD GO 93-03, p. 1] and "....to establish the public's trust in the Chicago Police Department through fair, objective, fact finding investigations into allegations of misconduct against its members." [OPS Mission Statement].

a      According to OPS Acting Administrator Michael Duffy [deposition, p. 278] OPS has lost a lot of people starting in 2004. The low would have been in 2006 when approximately 1/3 of the 60 OPS investigator positions were vacant.

b      At least ten investigators, supervisors, and members of management left OPS from December 2003 through 2004.  [p. 279]

c      Mr. Duffy was sure that OPS staffing issues from 2002-2006 were communicated to the City Council through the budget proceedings.

My opinions may be added to, or amended, upon review of additional information.

Respectfully submitted,

Dennis Waller

Encl.
   CV
   FS
   Testimony List

# EXHIBIT C

# In The Matter of

# BARRY GILFAND, et al

# vs.

# SGT. JEFFERY PLANEY, et al

## Deposition of
## DENNIS K, WALLER
## November 12, 2010

**Urlaub Bowen & Associates, Inc.**
**Certified Shorthand Reporters**
**Video Conference Center**
**312-781-9586**
**Fax 312-781--9228**
**info@urlaubbowen.com**
**www.urlaubbowen.com**

Deposition of DENNIS K, WALLER, 11/12/2010

                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
                           EASTERN DIVISION

BARRY GILFAND, AARON, GILFAND,      )
ADAM MASTRUCCI and SCOTT            )
LOWRANCE,                           )
                                    )
              Plaintiffs,           )
                                    )
         vs.                        )  No. 07 C 2566
                                    )
SGT. JEFFERY PLANEY, OFFICER        )
GREGORY BARNES, OFFICER             )  Judge
DEMETRIOS KEREAKES, OFFICER         )  Leinenweber
VINCENT MATTHEWS, OFFICER MATIAS    )
PADILLA, OFFICER PAUL POWERS,       )
OFFICER ERIKA WOOSLEY, SGT. DALE    )
KINGSLEY, OFFICER KENNETH           )
CARLYON, OFFICER FREDERICK          )
COLLINS, OFFICER CHRISTOPHER        )
LINDAHL, OFFICER NICOLE MAYOSKI,    )
OFFICER ANA PINA, OFFICER JESUS     )
ENRIQUEZ, OFFICER MICHAEL HOWE,     )
PROBATIONARY OFFICER DONALD         )
LUPO, PROBATIONARY OFFICER          )
GREGORY MORABITO, PROBATIONARY      )
OFFICER SARAH ZARCONE, and THE      )
CITY OF CHICAGO, a municipal        )
corporation,                        )
                                    )
              Defendants.           )


        The deposition of DENNIS K. WALLER, taken

pursuant to notice, before Karen M. Kane, Certified

Shorthand Reporter within and for the County of

Cook, State of Illinois, CSR No. 084-004706, at

30 North LaSalle Street, Suite 1720, Chicago,

Illinois, on November 12, 2010, commencing at 10:00

o'clock a.m.

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 2

1    APPEARANCES:

2         SMITH, JOHNSON & ANTHOLT, LLC, by
          MS. AMANDA C. ANTHOLT
3         (112 South Sangamon Street, Third Floor
           Chicago, Illinois 60607)
4            appeared on behalf of the plaintiffs;

5         MAYER BROWN, LLP, by
          MR. AARON CHAIT and
6         MS. JESSICA L. FELKER
          (71 South Wacker Drive
7          Chicago, Illinois 60606)
             appeared on behalf of the defendants,
8            Officer Paul Powers and Officer
             Gregory Barnes
9
          HONORABLE MARA S. GEORGES
10        CORPORATION COUNSEL, by
          MR. MATTHEW A. HURD
11        Deputy Corporation Counsel
          MR. GEORGE J. YAMIN, JR. and
12        MR. JORDAN MARSH
          Special Litigation Counsel
13        (30 North LaSalle Street, Suite 1720
           Chicago, Illinois 60602)
14           appeared on behalf of the defendant,
             The City of Chicago, a municipal
15           corporation

16

17                  * * * * * * *

18
                  I N D E X
19   Witness:                          Page

20   DENNIS K. WALLER

21        Examination by:
               Mr. Hurd.................... 3
22             Ms. Antholt................. 174

23

24        (Exhibits marked in confidential portion.)

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 3

1                        (Witness sworn.)

2                        DENNIS K. WALLER

3     called as a witness herein, having been first duly

4     sworn, was examined and testified as follows:

5                        EXAMINATION

6     BY MR. HURD:

7          Q.     Good day.

8          A.     Hi there.

9          Q.     Please state your name and spell your

10    name for the record.

11         A.     Dennis Waller, W-a-l-l-e-r.

12         Q.     What is your occupation or profession?

13         A.     Twofold, basically.  I'm a senior

14    partner in Waller & Associates, LLC.  We do private

15    investigations.

16                    I also am a consultant and sometimes

17    expert witness on police practices.

18         MS. ANTHOLT:  Matt, before we get into the

19    deposition, just in the interest of full

20    disclosure.  As I mentioned to you on the phone,

21    Mr. Waller has taken additional notes since the

22    notes we sent to you just in the course of his

23    preparation for the deposition.  So I just wanted

24    to make sure that's clear.

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 4

1          MR. HURD:  And those notes are where?

2          MS. ANTHOLT:  He has them.

3          MR. HURD:  Can I take a look at them?

4          THE WITNESS:  Sure.  I really don't know that

5     I can differentiate which ones are which; but, I

6     mean, there are some that I made recently and I

7     could probably identify others that I think I sent

8     you previously.

9          MS. ANTHOLT:  So they're mixed in with the

10    materials.

11         MR. HURD:  I take it there's no notes in your

12    CV.

13         THE WITNESS:  That was actually most of it.

14                   (Recess taken.)

15    BY MR. HURD:

16         Q.    Tell me about your two jobs.

17         A.    One, we do a variety of investigation

18    for primarily attorneys or private companies,

19    everything from background investigations, personal

20    injury, work-ups on cases, patent infringement

21    cases, sometimes some corporate intelligence.  So

22    it varies.

23         Q.    Okay.

24         A.    As far as a police practices

Deposition of DENNIS K, WALLER, 11/12/2010

Page 5

1    consultant, I've been retained over 500 times to

2    review matters primarily related to police policy

3    procedure and practice.  I guess the primary areas

4    are use of force, vehicle pursuits and

5    investigations, and various related issues.

6                    The split on that has been

7    approximately -- the last time I checked was about

8    55 percent defense and about 45 percent plaintiff

9    and they're from 32 states.  And I've been accepted

10   as an expert witness in Federal Court, State

11   Courts, and before administrative proceedings.

12        Q.    Have you ever testified on behalf of

13   the City of Chicago?

14        A.    Have I ever been retained by the City

15   of Chicago --

16        Q.    Have you ever testified on behalf of

17   the City of Chicago?

18        A.    I'm sure probably I've said something

19   good about them in the course of some cases, but

20   I've never been retained by them to testify or to

21   review a case.  I was asked once, but then they

22   rescinded the offer.

23        Q.    When was that?

24        A.    I don't know.  A number of years ago.

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 6

1    Some young attorney in your office called and said,

2    "Would you be willing to look over a case?"

3                   I said, "If I don't have a conflict,

4    sure."  I said, "But you might want to check."

5                   And then he called back in about a

6    half hour and said, "No thanks."

7        Q.    You have been retained to testify

8    against the City of Chicago?

9        A.    Well, I don't like the way you term

10   that.  I've been retained to review different

11   matters and give my opinions on an objective basis.

12   If that turned out that it was against the City, so

13   be it.

14                  Like I said, I'm sure in all that

15   testimony -- and there have been a number of

16   them -- I've had some kind things to say about some

17   people in the department.

18       Q.    How many times have you been retained

19   to testify against the City of Chicago?

20       A.    To testify or been retained to review

21   cases?  I mean, there's a difference.

22       Q.    Okay.

23       A.    I don't have a particular breakdown.

24   My best guess is probably between 25 and 40.

Deposition of DENNIS K, WALLER, 11/12/2010

1    That's a rough idea.

2          Q.    Has that been retained or is that --

3          A.    That would be -- my guess would be

4    retained.

5          Q.    How many of those cases did you testify

6    in?

7          A.    I don't have a good breakdown on that.

8    Some settled.  Some go away for other causes, and I

9    don't always find out why.

10          Q.    One of the things you've been retained

11    in this case is to review certain CRs.

12          A.    Certain what?

13          Q.    CRs.

14          A.    Yes, sir.

15          Q.    And you were reviewing those CRs is to

16    determine the reasonableness of the investigation

17    that was done?

18          A.    In the particular CRs?

19          Q.    Yes.

20          A.    Well, to assess the investigation that

21    was done --

22          Q.    Okay.

23          A.    -- or whether it wasn't done.

24          Q.    And what was the purpose of that?

Deposition of DENNIS K, WALLER, 11/12/2010

Page 8

1       A.    It was within the context of the civil

2  case filed against the City of Chicago and several

3  officers in this case in which some private

4  individuals were beaten up in a bar.  And the one

5  allegation is that there was an ongoing pattern and

6  practice of this type of conduct and that the City

7  of Chicago is ineffective in investigating that

8  type of officer misconduct.

9       Q.    And so you reviewed the CR files to

10  determine what?

11       A.    What they were doing, were they making

12  reasonable investigations, compared the nature and

13  type of investigations to nationally accepted

14  standards of practice, compared those to the

15  written department policy, the mission statement of

16  OPS, and also compared it to the previous review

17  that I did in 2003 in the Garcia case to see if

18  there had been any significant changes in the

19  actual practice of the City of Chicago.

20       Q.    And so one of the things you wanted to

21  determine was the reasonableness of the

22  investigation?

23       A.    Well, the scope.  Did it match written

24  policy requirements?  Is it consistent with

Deposition of DENNIS K, WALLER, 11/12/2010

Page 9

1    nationally accepted standards of practice?  Was an

2    investigation conducted?

3                    In some cases the investigations

4    were so superficial, you know, it would be

5    embarrassing to say that an investigation was

6    conducted.

7        Q.    But were you checking on the

8    reasonableness of the investigation that was done?

9        MS. ANTHOLT:  Objection; asked and answered.

10       THE WITNESS:  I think I looked at it from a

11   plethora of factors.  I don't know that I looked at

12   it particularly and made a column and said

13   "reasonable."  I didn't really do that.  I tried to

14   look at it in a totality of the material provided

15   to me.

16   BY MR. HURD:

17       Q.    In every investigation you recognize

18   that you could find something wrong with the

19   investigation?

20       A.    Well, certainly if you were nitpicking.

21   I mean, some are much more obvious than others.

22                    For example, if you have a license

23   plate and you don't run the license plate or

24   variations of the plate or match the plate with a

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 10

1    name or a description of somebody that was given,

2    then there was no follow-up, that certainly

3    wouldn't be what you would call a reasonable

4    effort.

5         Q.    Can you answer my question?

6         A.    I thought I did.

7         MR. HURD:  Can I have the question read back?

8                   (Record read.)

9    BY MR. HURD:

10        Q.    In every investigation you reviewed,

11   you could always find something more that they

12   could have done; isn't that true?

13        MS. ANTHOLT:  Objection; asked and answered.

14        THE WITNESS:  I guess potentially; but, I

15   mean, you look at it within reasonable parameters.

16   BY MR. HURD:

17        Q.    Right.  That's what I'm getting at.

18   You look at it through reasonable parameters,

19   right?

20        A.    I try to, yes, sir.

21        Q.    And reasonably there's some base level

22   of investigation you expect to be done; is that

23   true?

24        A.    I would expect an investigation to be

Deposition of DENNIS K, WALLER, 11/12/2010

Page 11

1    done, yes.

2        Q.    Right.  And while you may not agree

3    with all the steps that are taken in an

4    investigation, an investigation could be determined

5    to be reasonable?

6        A.    I don't understand your question, if

7    there was one.

8        Q.    You have some criticisms of the

9    investigations that were done in this case -- that

10   were done -- the 94 CR investigations that were

11   done?

12       A.    Yes, sir.

13       Q.    But you would admit that some things

14   they do, they do correctly?

15       MS. ANTHOLT:  Objection; vague.

16       THE WITNESS:  I would agree that that was --

17   I mean, I would have to have more specific

18   information.

19   BY MR. HURD:

20       Q.    You recognize that they accept CR

21   complaints?

22       A.    Who does?

23       Q.    The Office of Professional Standards in

24   this case.

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 12

1       A.      They have, yes, sir.

2       Q.      Okay.  And that's a good thing?

3       A.      By and large, yes.

4       Q.      Okay.

5       A.      And it's something they were created to

6   do.

7       Q.      And they track those complaints with an

8   assigned CR number?

9       A.      Yes, sir.

10      Q.      And they interview the complainant?

11      A.      Not always.

12      Q.      But the majority of the time they do

13  interview the complainant?

14      A.      Probably.

15      Q.      And in many instances they interview

16  the complainant twice?

17      A.      Sometimes, yes, sir.

18      Q.      Where it's appropriate they do an area

19  canvas?

20      A.      There's indications that they have done

21  that in some cases, yes, sir, and not in others.

22      Q.      And they've located additional

23  witnesses by doing that?

24      A.      I don't recall any particular case

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 13

1    where that has had a significant result.  None come

2    really to mind, but certainly it is an appropriate

3    practice to do a canvas.

4         Q.    And if they did locate additional

5    witnesses, it would be appropriate to follow up

6    with those witnesses?

7         A.    Sure.  Let me go back.  It depends on

8    how the canvas was conducted.  Say the incident

9    occurs at 1:00 or 2:00 a.m. on a weekend and you go

10   around between 9:00 and noon on a weekday, the

11   likelihood of that being productive is not great.

12              So there are ways of conducting

13   canvases that are productive and appropriate and

14   there are ways that are more just to give the

15   illusion of an investigative process, but they're

16   not likely to reveal anything substantive.

17        Q.    Okay.  Pictures are taken of

18   individuals where it's appropriate?

19        MS. ANTHOLT:  I'm going to object to the form

20   of the question because I don't even understand it.

21   Are you asking about the CR files at issue or

22   general practices?  I don't know what you're asking

23   about.

24

Urlaub Bowen & Associates, Inc. 312-781-9586

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 14

1    BY MR. HURD:

2         Q.    The 94 CR files you reviewed for this

3    case --

4         A.    There were examples of where they had

5    taken photographs.

6         Q.    And that was an appropriate thing to

7    do?

8         A.    Sure.

9         Q.    Department reports were obtained?

10        A.    In some cases, yes.  Others they were

11   not taken.

12        Q.    And it was appropriate to collect those

13   department reports for those CRs?

14        A.    Where they were available, yes, sir,

15   that would be.

16        Q.    And evidence was seized in some cases?

17        A.    I don't recall any where OPS actually

18   did and it may just be escaping my recall at this

19   point, but I don't recall any other than

20   photographs where they have actually seized

21   evidence.

22        Q.    And if they did that, would that be

23   appropriate?

24        A.    It would depend on the context.

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

1        Q.      They collect and transcribe phone

2    calls?

3        A.      To some degree, yes, sir.

4        Q.      And that's an appropriate thing to do?

5        A.      It may be.  Again, depending on whether

6    it's substantive or not.

7        Q.      They obtain medical records?

8        A.      In some cases, yes, sir.

9        Q.      And that would be an appropriate thing

10   to do?

11       A.      Yes, sir.

12       Q.      They documented the investigative steps

13   by memos to their supervisors?

14       A.      They generally document what they have

15   done.  They don't generally document investigative

16   steps.

17                    One of the criticisms I have is that

18   a lot of the investigations were incomplete or

19   inadequate.  So as far as an investigative process,

20   not always.  As far as generally what they did or

21   sometimes didn't do, they have included that in the

22   file.

23       Q.      But it's an appropriate thing to

24   document what steps they have taken?

Deposition of DENNIS K, WALLER, 11/12/2010

1       A.     If they've taken steps, yes, sir.

2       Q.     And you've seen evidence where they've

3    documented those steps?

4       A.     In some of those cases, yes, sir.  In

5    others it was -- the deficiency was extremely

6    obvious.

7       Q.     They wrote a final report?

8       A.     In most cases there was, yes, sir.

9       Q.     And that report indicated that person's

10   findings?  Yes?

11      A.     Usually, yes, sir.

12      Q.     And they were normally based on the

13   evidence?

14      A.     Not necessarily.  If the investigation

15   was inadequate and the finding was as a result of

16   an inadequate investigation, it's not

17   necessarily -- it's based on what evidence they

18   turned up, but not necessarily what evidence may

19   have been available.

20      Q.     Okay.  Any investigation could be said

21   to be inadequate because they did not do enough

22   steps?

23      A.     No.  I think that you can show that you

24   made reasonable efforts to follow through, and that

Deposition of DENNIS K, WALLER, 11/12/2010

Page 17

1    can be documented and included in the file.

2         Q.    Reasonable efforts?

3         A.    Yes, sir.

4         Q.    Okay.  So if they've taken reasonable

5    efforts to do an investigation, that's sufficient?

6         A.    I need more information.  If they've

7    done a conscientious job to investigate the

8    particular allegation and to the extent that they

9    could reasonably push that investigation, then I

10   would say that would be adequate.

11               If in other cases if they either

12   overlooked or disregarded or didn't bother or

13   whatever and just came to a conclusion, that's

14   inadequate.

15        Q.    You're determining what's reasonable?

16        A.    In my opinion, yes.  And that's based

17   on having been both a police investigator, police

18   supervisor, police administrator, teaching

19   investigation techniques to officers, teaching

20   criminal investigation at the college level,

21   teaching administrative investigations, that

22   function; having reviewed over 500 cases, most of

23   which had comprehensive police investigations

24   attached.  So to review those and to say I think I

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

1    have a pretty good feel for what may be adequate

2    and what is not adequate.

3        Q.    But it's your determination of what's

4    reasonable?

5        A.    Based on the totality of my training,

6    education, and background, yes, sir.

7        Q.    And in 13 of the 94 files you reviewed,

8    you found that they were sustained?

9        A.    Yes, sir.

10       Q.    Do you know what percent that is?

11       A.    I don't think it's relevant, but I

12   didn't do the math.  So it's probably maybe 11

13   percent, roughly.

14       Q.    13 of 94 is closer to 15 percent.

15       A.    You have to discard the one that wasn't

16   law enforcement.  You have to disregard the one

17   that wasn't sustained based on the excessive force.

18   It was sustained because the guy was urinating in

19   public, and there are a couple other issues.  I

20   would say realistically that was more 10, 11

21   percent.

22       Q.    So you found an 11 percent sustained

23   rate?

24       A.    No, I didn't say that.  I said roughly

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 19

1   and of those cases that I reviewed.

2        Q.    Of the cases you reviewed, you found

3   roughly a 11 percent sustain rate?

4        A.    Yes, sir.

5        Q.    Do you know how that fits with the

6   national average?

7        MS. ANTHOLT:  Objection; vague as to fits

8   with the national average.

9        THE WITNESS:  I think it's less than 10

10  percent or thereabouts is the national average for

11  sustained cases under administrative

12  investigations.

13              For several years, I believe

14  including the year this occurred, the stats for the

15  City of Chicago by their own report showed it was

16  more like 2 percent or 3 percent.

17  BY MR. HURD:

18       Q.    Pardon me?

19       A.    I said the stats for the City of

20  Chicago during this time was more like 2 percent or

21  3 percent annually.

22       Q.    And you base that on plaintiff's

23  answers to interrogatories?

24       A.    Based on information provided by the

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 20

1    City of Chicago.

2          Q.    Can you show me where you base that on?

3          A.    Reference to the Chicago Police

4    Department annual reports --

5          Q.    Sir --

6          A.    -- it was a quote from them or a

7    reference from them, and it was contained

8    specifically in plaintiff's answers to defendant,

9    City of Chicago, second set of interrogatories.

10         Q.    So it's plaintiff's answers, that's

11   where you got that figure?

12         MS. ANTHOLT:  Objection; asked and answered.

13         THE WITNESS:  Based on information provided

14   by the City of Chicago.

15   BY MR. HURD:

16         Q.    But in any event, we have an 11 percent

17   sustained rate here?

18         A.    Of these particular cases.

19         Q.    Yes, sir.

20         A.    Yes, sir.

21         Q.    And that's extraordinarily good?

22         MS. ANTHOLT:  Objection to the

23   characterization of "extraordinarily."

24         THE WITNESS:  I wouldn't say that.

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 21

1    BY MR. HURD:

2        Q.    Well, you said the national average is

3    below 10 percent.

4        A.    Well, some of these weren't based on

5    the investigation.  Some of these were based that

6    prior -- or other agencies had arrested the

7    officers involved.  I believe --

8        Q.    So what.

9        A.    So what?

10       Q.    So what.

11       A.    So there wasn't an investigation

12   initiated to determine the wrongdoing.  These were

13   complaints of -- they weren't complaints initiated

14   to OPS by a private citizen.

15       Q.    What --

16       MS. ANTHOLT:  Objection.  Matt, you are

17   cutting him off.

18       THE WITNESS:  Now, I'll let you speak and you

19   let me speak.  These weren't generated as a result

20   of an OPS investigation.  They were generated as a

21   result of an arrest by another agency.

22   BY MR. HURD:

23       Q.    And then an OPS investigation was

24   generated, right?

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 22

1      A.    Of sorts.  Basically the information

2    was collected from the other agency.

3      Q.    Okay.  But an OPS investigation was

4    begun?

5      A.    An investigation, per se, probably not.

6    A compilation of records, yes.

7      Q.    And you find the difference to be what?

8      A.    Between an investigation and a

9    compilation of records?

10     Q.    Yes.

11     A.    A compilation of records, you're just

12   gathering what somebody else has provided and what

13   may or may not be available.

14          In an investigation you're looking

15   into details.  You're interviewing people, not

16   pitching softballs or cream puff questions.  You're

17   doing follow-up questions and interviews.  You are

18   gathering information and you're recording it all.

19     Q.    And in those instances where you had

20   outside agencies involved, if they interviewed

21   people and gathered information, would you say that

22   there was an investigation being done?

23     A.    Depending on the extent of what they

24   did.  It may or may not be.  It may be a

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 23

1    compilation of records or it may be an actual

2    investigation.

3         Q.    And that would depend on what they did?

4         A.    Yes, sir.

5         Q.    Now, going back to things that they did

6    in the 94 CRs that you reviewed.  They made

7    reasonable penalty recommendations, true?

8         A.    In the sustained cases?

9         Q.    Uh-huh.

10        A.    They made recommendations -- ultimately

11   OPS made recommendations and then they went through

12   a series of review processes.

13        Q.    And was that appropriate?

14        A.    Some agencies in the internal affairs

15   function, they don't make recommendations.  It's

16   left to the administration.  So it may or may not

17   be.

18        Q.    And did you feel it was appropriate in

19   this cases that you reviewed?

20        A.    I really didn't take it into

21   consideration.  I looked at the final result.

22        Q.    And in the 94 CRs that were reviewed,

23   they maintained records of their investigation

24   findings, correct?

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 24

1        A.    In most of the files there was, yes.

2        Q.    And that was an appropriate thing to

3   do?

4        A.    Yes.

5        Q.    Let's look at the CR files.

6                    (Pages 27-183 were deemed

7                     confidential and bound under

8                     separate cover.)

9

10                * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7468d3da-76da-415e-95c9-994c986fe382

Deposition of DENNIS K, WALLER, 11/12/2010

Page 25

```
 1   STATE OF ILLINOIS )
                      ) SS:
 2   COUNTY OF COOK   )

 3        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 4                   EASTERN DIVISION

 5   BARRY GILFAND, ET AL      )
                               )
 6           Plaintiffs,       )
                               )
 7       vs.                   ) No. 07 C 2566
                               )
 8   SGT. JEFFERY PLANEY, ET AL,)
                               ) Judge Leinenweber
 9           Defendants.       )

10        This is to certify that I have read my

11   deposition taken on November 12, 2010, in the

12   foregoing cause, and that the foregoing transcript

13   accurately states the questions asked and the

14   answers given by me, with the changes or

15   corrections, if any, made on the Errata Sheet

16   attached hereto.

17

18
                             DENNIS K. WALLER
19

20   No errata sheets submitted (Please initial)
     Number of errata sheets submitted      (pgs.)
21

22   Subscribed and sworn to
     before me this      day
23   of              2010.

24
          Notary Public
```

Urlaub Bowen & Associates, Inc. 312-781-9586

Deposition of DENNIS K, WALLER, 11/12/2010

Page 26

```
 1   STATE OF ILLINOIS    )
                          )  SS:
 2   COUNTY OF COOK       )

 3            I, Karen M. Kane, a Certified Shorthand
     Reporter in and for the County of Cook and State of
 4   Illinois, do hereby certify that DENNIS K. WALLER
     was duly sworn to testify the whole truth, and that
 5   the foregoing deposition was recorded
     stenographically by me and was reduced to
 6   computerized transcript under my direction, and
     that the said deposition constitutes a true record
 7   of the testimony given by said witness.

 8            I further certify that the reading and
     signing of the deposition was not waived, and the
 9   deponent was notified, via U.S. Mail, of the
     availability of the transcript for review and
10   signature.  Pursuant to Rule 207(a) of the Supreme
     Court of Illinois, if deponent does not appear or
11   read and sign the deposition within 28 days, or
     make other arrangements for reading and signing,
12   the deposition may be used as fully as though
     signed, and this certificate will then evidence
13   such failure to appear as the reason for signature
     not being obtained.
14
              I further certify that I am not a
15   relative or employee or attorney or counsel of any
     of the parties, or a relative or employee of such
16   attorney or counsel, or financially interested
     directly or indirectly in this action.
17
              IN WITNESS WHEREOF, I have hereunto set
18   my hand and affixed my seal of office at Chicago,
     Illinois, this 15th day of November, A.D. 2010.
19

20

21
              _____
22            Illinois CSR No. 084-004706

23

24
```

Urlaub Bowen & Associates, Inc. 312-781-9586

7468d3da-76da-415e-95c9-994c986fe382

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BARRY GILFAND, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **07 C 2566** |
| **v.** | ) | |
| | ) | **Judge Leinenweber** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**RESTRICTED DOCUMENT PURSUANT TO LOCAL RULE 26.2**

The document attached hereto, the confidential deposition transcript of Dennis Waller, is

being filed under seal as a Restricted Document pursuant to Northern District of Illinois Local

Rule 26.2 and  in accordance with the Qualified HIPAA and Confidential Matter Protective

Order entered on December 21, 2007.  Dkt. at 55.

Respectfully Submitted,

/s/ Lindsey Vanorny
Lindsey Vanorny
Assistant Corporation Counsel
30 North LaSalle, Suite 900
Chicago, Illinois 60602
lindsey.vanorny@cityofchicago.org
(312) 742-0234
Attorney No. 6303642